Mrs. William STANSBURY, Appellant,

v.

Dr. Eugene BECKSTROM, Appellee.

No. 4593.

Court of Civil Appeals of Texas, Eastland.

Feb. 9, 1973.

James P. Finstrom, Dallas, for appellant.

Robert A. Kraft, Dallas, for appellee.

McCLOUD, Chief Justice.

This appeal is from an order granting a temporary injunction enjoining defendant, Mrs. William Stansbury, from displaying signs of any type in front of plaintiff's office, and from parading, standing, sitting or lying in front of plaintiff's office. Plaintiff, Dr. Eugene Beckstrom, alleged that defendant paraded in front of his office displaying signs which were false and libelous. Plaintiff sought damages and injunctive relief. The trial court granted a temporary injunction and the defendant, Mrs. Stansbury, has appealed. We reverse and dissolve the temporary injunction.

Mrs. Stansbury argues that the granting of the temporary injunction is in violation of the rights granted to her under the First Amendment to the Constitution of the United States which prohibits "abridging the freedom of speech, or of the press . . .", and also in violation of the rights granted to her under Article 1, Section 8 of the Constitution of the State of Texas, Vernon's Ann.St. which guarantees that "every person shall be at liberty to speak, write or publish his opinions on any subject . . ." We agree.

There is evidence that the defendant, her husband, and three other people displayed signs and paraded in front of plaintiff's office. Defendant testified that she was protesting a bill charged by the doctor for medical treatment administered to her son. She contends the bill was excessive. Plaintiff says that the charge was customary and proper.

We think the disposition of this matter is controlled by the recent United States Supreme Court case of Organization for a Better Austin et al. v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). There the defendants distributed leaflets accusing Keefe, a real estate broker, of engaging in "panic peddling" activities. The distribution of leaflets was peaceful, did not disrupt pedestrian or vehicular traffic, and did not precipitate any fights, disturbances, or other breaches of the peace. The trial court granted a temporary injunction enjoining defendants "from passing out pamphlets, leaflets or literature of any kind, and from picketing anywhere in the City of Westchester, Illinois." The Appellate Court of Illinois, First District, 115 Ill. App.2d 236, 253 N.E.2d 76, affirmed, holding that the defendants' activities invaded Keefe's right of privacy, that the activities were coercive, and that the defendants' right of free speech was not involved. In an opinion by Chief Justice Burger, the United States Supreme Court reversed stating:

"This Court has often recognized that the activity of peaceful pamphleteering

is a form of communication protected by the First Amendment, e. g., Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L. Ed. 155 (1939); Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). In sustaining the injunction, however, the Appellate Court was apparently of the view that petitioners' purpose in distributing their literature was not to inform the public, but to 'force' respondent to sign a no-solicitation agreement. The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment. Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper. See Schneider v. State, supra; Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Petitioners were engaged openly and vigorously in making the public aware of respondent's real estate practices. Those practices were offensive to them, as the views and practices of petitioners are no doubt offensive to others. But so long as the means are peaceful, the communication need not meet standards of acceptability.

Any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity. Carroll v. Princess Anne, 393 U.S. 175, 181, 89 S.Ct. 347, 21 L.Ed.2d 325, 331 (1968); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584, 593 (1963). Respondent thus carries a heavy burden of showing justification for the imposition of such a restraint. He has not met that burden. No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court. Designating the conduct as an invasion of privacy, the apparent basis for the injunction

here, is not sufficient to support an injunction against peaceful distribution of informational literature of the nature revealed by this record."

It has been frequently said that the right of one to speak ill of another is protected by the Bill of Rights, Section 8 of Article 1 of the Constitution of the State of Texas, and a court has no power to control by injunction what one person says of another. Dallas General Drivers, etc. v. Wamix, Inc. of Dallas, 156 Tex. 408, 295 S. W.2d 873 (1956). In the early case of Ex parte Tucker, 110 Tex. 335, 220 S.W. 75 (1920), the Court used clear and forceful language in discussing the reasons for protecting the freedom to speak from injunctive restraint. The Court said:

"It has never been the theory of free institutions that the citizen could say only what courts or legislatures might license him to say, or that his sentiments on any subject or concerning any person should be supervised before he could utter them. Nothing could be more odious, more violative or destructive of freedom, than a system of only licensed speech or licensed printing. * * *

There can be no justification for the utterance of a slander. It cannot be too strongly condemned. The law makes it a crime. But there is no power in courts to make one person speak only well of another. The Constitution leaves him free to speak well or ill; and if he wrongs another by abusing this privilege, he is responsible in damages or punishable by the criminal law.

Equity will protect the exercise of natural and contractual rights from interference by attempts at intimidation or coercion. Verbal or written threats may assume that character. When they do, they amount to conduct, or threatened conduct, and for that reason may properly be restrained."

■ In the last paragraph quoted above, the Court clearly stated that an injunction could be properly issued if the language used was intimidating and coercive in character. In Lawrence v. Atwood, 295 S.W.2d 298 (Tex.Civ.App.—Beaumont 1956, no writ hist.) and McMorries v. Hudson Sales Corp., 233 S.W.2d 938 (Tex.Civ.App.—El Paso 1950, no writ hist.), both of which involved disenchanted consumers, temporary injunctions which enjoined the displeased consumers from displaying uncomplimentary signs were dissolved. In each case, however, the Courts indicated that an injunction might be upheld under proper pleadings and evidence showing that the activities were being conducted in order to coerce or intimidate. As observed recently, however, by Justice Keith in Amalgamated Meat Cutters v. Carl's Meat & Provision Co., 475 S.W.2d 300 (Tex.Civ.App.—Beaumont 1971, dism.), in view of *Keefe*, supra, it now seems settled that even though expressions are intended to exercise a coercive impact these expressions are nevertheless protected under the First Amendment to the Constitution of the United States.

We are told in *Keefe*, supra, that in a case of this kind we are not concerned with the truth or validity of the publication. We think, however, it might be helpful to briefly outline the controversy between the parties. Mrs. Stansbury's son was injured. He went to the office of Dr. Beckstrom who administered a special splint with a forearm cast. The doctor testified that the fifth metacarpal bone was fractured. He described the injury as an injury to the hand. Mrs. Stansbury characterized the injury as an injury to the little finger. Mrs. Stansbury testified that she was Grievance Chairman for the Consumer Education & Protective Association, a consumer organization referred to as "CEPA". She filed a grievance with the Ethics Committee of the Dallas Osteopathic Board. The committee met and established that the fee charged was not unreasonable. Mrs. Stansbury testified that she was not allowed to meet with the committee. After learning that her grievance had been denied, she initiated the activities complained of by Dr. Beckstrom.

The signs carried and displayed on defendant's automobile which was parked in front of plaintiff's office were substantially as follows:

"Drs. Beckstrom's Outrageous Charges $185.00 To Set Finger—Unfair Price—CEPA"

"Don't Let This Kind of Charges Increase Your Ins.—CEPA"

"Drs. Beckstrom's Charge $185.00 To Set Finger—Medical Board Says 'No Help'—CEPA"

"Protest To All State & U. S. Comms. —CEPA"

Mrs. Stansbury testified that she notified the police department before she picketed the office of Dr. Beckstrom. There is no evidence that she interfered in any way with pedestrian or vehicular traffic. We think *Keefe*, supra, is controlling and the temporary injunction must be dissolved.

The order of the trial court is reversed and the temporary injunction dissolved.