# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00009-CV

**Andrew Brammer and Yolanda Brammer, Appellants**

**v.**

**KB Home Lone Star, L.P., Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. GN204355, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## O P I N I O N

This is an interlocutory appeal challenging the district court's order granting a temporary injunction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (West Supp. 2003). Appellee KB Home Lone Star, L.P. ("KB Home") applied for and obtained a temporary injunction to enjoin appellants Andrew and Yolanda Brammer from defaming or disparaging KB Home. The temporary injunction also places restrictions on the Brammers' participation in demonstrations at KB Home subdivisions. We conclude that portions of the injunction infringe upon the Brammers' freedom of expression guaranteed by the First Amendment to the United States Constitution and by article I, section 8 of the Texas Constitution. *See* U.S. Const. amend. I; Tex. Const. art. I, § 8. We therefore modify the temporary injunction and, as modified, affirm the district court's order granting the temporary injunction.

# BACKGROUND

KB Home builds homes in several subdivisions in the Austin area. The Brammers purchased a KB Home in the fall of 2000, and within a few months experienced problems with their new home. KB Home made repairs to the Brammers' home under the warranty. Following the repairs, the Brammers contacted KB Home and complained that the repairs had seriously disrupted their lives, especially because Yolanda Brammer had taken time off from her employment to be present at the home while the KB Home representatives performed the warranty work. Yolanda Brammer felt that she was entitled to some sort of compensation from KB Home, and suggested to Larry Oglesby, KB Home-Austin's president, that unless compensated she would create adverse publicity for KB Home by speaking to the Brammers' neighbors as well as others. According to Oglesby, he began discussing with Yolanda Brammer a "remedy to the situation," fearing that the Brammers' dissatisfaction could become "a very large issue."

On June 11, 2001, the Brammers and Oglesby negotiated a contract ("the Agreement") under which KB Home would compensate the Brammers for their inconvenience and give them items outside their warranty. The Agreement, which is a letter from Oglesby to the Brammers, reads in pertinent part:

> This letter will serve as our agreement ("Release") to resolve any and all of our differences relating to the purchase of your home. In consideration of your agreement to waive and release any and all claims related to your home, KB Home will agree to the following:
>
> 1.  Install a glass fireplace enclosure.
>
> 2.  Provide you with 8 pallets of sod.

2

3. Install gutters on the home. Color to be chosen by you.

4. Installation of refrigerator . . . .

5. $2,000.00.

By signing below, you hereby agree that this is good and adequate consideration for this Release, and no further compensation, in the form of upgrades, product or cash, will be paid to you and your family by KB Home.

The payment of this consideration and performance of these actions is conditioned upon a full and final release of KB Home, its affiliates, and its employees, officers, directors, agents and representatives of KB Home from any and all claims related to all outstanding issues. Moreover, you expressly agree that the terms of this settlement and Release are to remain strictly confidential and may not be disclosed to any third party without our written consent. Furthermore, you agree not to use any public medium such as the "internet" or any broadcast or print medium or source to complain or disparage the building quality or practices of KB Home, it being acknowledged that any complaints or actions against KB Home are to be resolved solely in a private manner.

This Release will not act as a waiver of any warranties that may be applicable to your residence.

. . . .

Several months after entering into the Agreement, the Brammers noticed other quality defects in their home, which they reported to KB Home. They complained of a water leak, uneven flooring, crooked walls, unlevel doors that would not close properly, a cracking driveway, loosened gutters, holes in the garage walls, and inoperative electrical outlets. Again the Brammers requested compensation outside their warranty. When KB Home refused, Yolanda Brammer told Oglesby, "You have a lawsuit coming." In May 2002, the Brammers' attorney sent KB Home written notice that it had violated the Texas Residential Construction Liability Act. *See* Tex. Prop. Code Ann. § 27.003 (West 2000). The Brammers' attorney requested that KB Home not contact his clients, and

3

thereafter the Brammers refused KB Home access to their home for the purpose of making inspections or repairs.

Meanwhile, convinced that KB Home had sold them a "lemon," the Brammers began participating in demonstrations organized by Homeowners for Better Building (HOBB). HOBB demonstrations occurred at various KB Home neighborhoods, KB Home's main office, and at rallies in support of a home "lemon" law at the state capitol and city council meetings. In October 2002, during a HOBB demonstration at the grand opening of a KB Home subdivision, the Brammers were approached by a News 8 Austin TV reporter who asked if he could interview them at their home. The Brammers agreed. The interview footage was aired in a news story and showed the defective features of the Brammers' home.

On December 5, 2002, KB Home filed an original petition and an application for a temporary restraining order, temporary injunction and permanent injunction. In its petition, KB Home alleged that the Brammers were liable for (1) breach of contract because they had publicly complained about and disparaged the building quality and practices of KB Home, in violation of the Agreement; (2) tortious interference with contract as a result of the Brammers' picketing activities at KB Home sites and the news interview; and (3) slander, libel, and business disparagement. KB Home's application for injunctive relief sought to enjoin the Brammers from engaging in these activities for the purpose of slandering, defaming, or publicly disparaging KB Home's business in any manner because KB Home continuously suffered irreparable harm in the form of "increasing damage to its reputation daily, including loss of customers and loss of goodwill." The district court

4

granted the temporary restraining order the same day and set a hearing on the temporary injunction for December 19, 2002.

Following a hearing, the district court granted the temporary injunction. In support of its decision, the court found that: (1) the injunction served governmental interests by maintaining public safety and order; (2) KB Home has no adequate remedy at law because it will never know the extent of damage to its reputation caused by the defamation and the damage to its reputation cannot be proved with specificity; (3) the general health, safety, and welfare of the public will suffer irreparable harm in the absence of the injunction; and (4) the injunction maintained the status quo. Until final judgment is rendered in the pending suit, the Brammers are enjoined from:

 (a) directly or indirectly slandering or defaming Plaintiff in any way, or from directly or indirectly disparaging Plaintiff's business;

 (b) directly or indirectly contacting Plaintiff's existing customers, Plaintiff's prospective customers or Plaintiff's employees, when the communication includes direct or indirect slander or defamation of Plaintiff in any way, or direct or indirect disparagement of Plaintiff's business;

 (c) coming within 75 feet of Plaintiff's sales offices, business offices, model homes and/or any construction site on which Plaintiff is constructing a home;

 (d) blocking any public roadways or sidewalks within 600 feet of, or blocking any ingress to or egress from Plaintiff's sales offices, business offices, model homes and/or any construction site on which Plaintiff is constructing a home;

 (e) shouting, yelling, using bullhorns, auto horns or sound amplification equipment when demonstrating in the allowed buffer zone around Plaintiff's sales offices, business offices, model homes and/or any construction site on which Plaintiff is constructing a home;

 (f) using any public medium, radio, television, public meetings, internet, and/or any broadcast or print medium to complain, disparage, or defame Plaintiff's construction quality or business practices.

The temporary injunction also specifically enjoins Andrew Brammer from verbally or physically threatening or verbally abusing KB Home's employees, actual customers, or prospective customers.

In five issues, the Brammers argue that the injunction should be dissolved because: (1) the remedy of specific performance is not available for an alleged breach of the Agreement; (2) the only remedy for defamation is an action for damages; (3) the injunction constitutes an unconstitutional prior restraint on the Brammers' free speech and free assembly rights; (4) the district court abused its discretion insofar as there was no evidence to support the finding that KB Home will suffer imminent and irreparable injury in the absence of the injunction, and because the order uses overly broad language; and (5) the Agreement does not prohibit the actions complained of by KB Home, and the Agreement is vague and thus unenforceable against the Brammers.

## STANDARD OF REVIEW

In an appeal from an order granting or denying a request for a temporary injunction, appellate review is confined to the validity of the order that grants or denies the injunctive relief. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). The decision to grant or deny the injunction lies within the sound discretion of the court, and we will not reverse that decision absent a clear abuse of discretion. *See id*. This Court may neither substitute its judgment for that of the trial court nor consider the merits of the lawsuit. *See id*.; *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 576 (Tex. App.—Austin 2000, no pet.). We may not reverse a trial court's order if the trial court was presented with conflicting evidence and the record includes evidence that reasonably supports the trial court's decision. *Universal Health Servs.,* 24 S.W.3d at 576. Rather, we view the

6

evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary as to exceed the bounds of reasonable discretion. *Id*. (citing *CRC-Evans Pipeline Int'l, Inc. v. Myers*, 927 S.W.2d 259, 262 (Tex. App.—Houston [1st Dist.] 1996, no writ)). We will reverse the order if the trial court misapplies the law to established facts or if it concludes that the applicant has demonstrated a probable injury or a probable right to recover and the conclusion is not reasonably supported by the evidence. *See Reagan Nat'l Adver. v. Vanderhoof Family Trust*, 82 S.W.3d 366, 370 (Tex. App.—Austin 2002, no pet.).

## DISCUSSION

The purpose of a temporary injunction is to preserve the status quo pending a trial on the merits. *Walling*, 863 S.W.2d at 58. It is an extraordinary remedy and does not issue as a matter of right. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id*.

### *Restrictions on Content-Based Speech*

Paragraphs (a), (b), and (f) of the temporary injunction enjoin the content of the Brammers' speech. According to the district court's order, KB Home is entitled to the temporary injunction in part because the Brammers' activities and assertions disparaged and wrongfully interfered with KB Home's contracts and business reputation. The order also states that KB Home

7

is further entitled to the temporary injunction because the Brammers violated the Agreement by publicly disparaging the building quality and business practices of KB Home. We conclude that the temporary injunction is not warranted on either of these bases because it constitutes an unconstitutional prior restraint on the Brammers' freedom of expression. Furthermore, there is no evidence that the Brammers waived their free speech rights by entering into the Agreement.

### 1. Prior restraint

Assuming KB Home has a probable right to recovery of damages following a trial on the merits, it has failed to prove probable injury in the interim. To demonstrate probable injury or harm, an applicant must show an injury for which there can be no real legal measure of damages or none that can be determined with a sufficient degree of certainty, *i.e.*, a noncompensable injury. *Universal Health Servs.,* 24 S.W.3d at 577 (citing *Texas Indus. Gas v. Phoenix Metallurgical Corp.*, 828 S.W.2d 529, 533 (Tex. App.—Houston [1st Dist.] 1992, no writ)). An adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief. *Id.*; *Texas Indus. Gas*, 828 S.W.2d at 532; *Surko Enters., Inc. v. Borg-Warner Acceptance Corp.*, 782 S.W.2d 223, 225 (Tex. App.—Houston [1st Dist.] 1989, no writ).

To prove a probable injury in the interim at the temporary injunction hearing, KB Home introduced evidence that as a result of the Brammers' defamatory and disparaging activities, it was suffering loss of clientele and that the resulting damages could never be determined with any degree of certainty.[1] KB Home's alleged injuries amounted to the normal injuries suffered when a

---

[1] According to Oglesby, KB Home had lost specific contracts as a result of the Brammers' conduct because when a potential customer "pull[s] up and there's a mob in front and they're

8

business is defamed or disparaged. It is well settled that Texas courts will not grant injunctive relief in defamation or business disparagement actions if the language enjoined evokes no threat of danger to anyone, even though the injury suffered often cannot easily be reduced to specific damages. *See Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex. 1983) (citing *Ex parte Tucker*, 220 S.W. 75, 76 (Tex. 1920)). In *Hajek*, an automobile dealership brought a libel action against an automobile owner and obtained a temporary injunction to prevent the owner from driving his vehicle with the message that the dealership sold him a "lemon." *Id.* at 254. The supreme court held that because the language enjoined evoked no threat of danger to anyone, the injunction constituted an unconstitutional prior restraint on free speech.[2] *Id.* at 255.

The holding in *Hajek* follows from the principle that a temporary injunction that constitutes a prior restraint on expression comes before a court with a "heavy presumption" against its constitutional validity. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). In

---

accosting cars, and they're yelling through bull horns, you're going to find a better environment to take your family." He testified that one KB Home community being picketed had "four cars pull in last week and just leave." Oglesby also stated that KB Home had no way to determine the sales lost as a result of the picketing activities and the News 8 Austin broadcast featuring the Brammers' interview. The district court also heard the testimony of Tanya Vargas, a KB Home salesperson, who related an incident in which Andrew Brammer followed her and customers to a home for showing, all the while loudly disparaging KB Home with a bullhorn. According to Vargas, although those customers expressed interest in buying in a KB Home subdivision, they would not buy in the one where the Brammers had protested because of safety concerns. As of the date of the temporary injunction hearing, they had not purchased a home from KB Home.

[2] The United States and Texas Constitutions prohibit prior restraints on free speech. *See* U.S. Const. amend. I; Tex. Const. art. I, § 8; *see also Davenport v. Garcia*, 834 S.W.2d 4, 9 (Tex. 1992) ("[I]t has been and remains the preference of this court to sanction a speaker after, rather than before, the speech occurs.").

9

*Keefe*, the United States Supreme Court vacated a preliminary injunction that enjoined an organization from distributing leaflets criticizing the applicant's real estate business practices. *Id*. at 419-20. The Court stated: "No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court." *Id*. at 419; *see also Pirmantgen v. Feminelli*, 745 S.W.2d 576, 578 (Tex. App.—Corpus Christi 1988, no writ) ("[P]rior restraints against leafletting or the distribution of pamphlets is particularly suspect.").

Prior restraints may withstand constitutional scrutiny only when a trial court makes specific findings supported by the evidence that (1) an imminent and irreparable harm will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm. *Davenport v. Garcia*, 834 S.W.2d 4, 10 (Tex. 1992). Here, the district court found that the Brammers' conduct caused damage to KB Home's reputation, including loss of customers and goodwill, and that KB Home "will never know to whom the *defamation* has been made or the extent of the damages to its reputation." (Emphasis added.) Although the specific damages sustained from defamation and business disparagement-related activity is often difficult to measure, it is nonetheless well established that this type of harm does not rise to the level necessary for the prior restraint to withstand constitutional scrutiny. For example, a Texas court of appeals, relying on *Keefe*, dissolved an injunction obtained by a doctor when a dissatisfied patient picketed outside the doctor's office with signs disparaging the doctor's business practices. *See Stansbury v. Beckstrom*, 491 S.W.2d 947, 950 (Tex. Civ. App.—Eastland 1973, no writ). Alleging that the signs were false and libelous, the doctor sought injunctive relief and damages. *Id*. at 947. Although the

10

complained-of injury in *Stansbury* was similar to the alleged injury in this case, as a matter of law it did not satisfy the probable injury requirement for a temporary injunction because the prior restraint on the patient's speech did not pass constitutional muster. *Id*. at 949 ("[I]t now seems settled that even though expressions are intended to exercise a coercive impact these expressions are nevertheless protected under the First Amendment to the Constitution of the United States.").

KB Home contends that the Brammers' speech is not entitled to constitutional protection because it is misleading or false commercial speech. KB Home cites *Central Hudson Gas & Electric v. Public Service Commission*, 447 U.S. 557, 561 (1980), and *Amalgamated Acme Affiliates, Inc. v. Minton*, 33 S.W.3d 387, 393-95 (Tex. App.—Austin 2000, no pet.), and argues that in light of these cases, *Hajek* must have been wrongly decided because it employed the "threat of danger" test to commercial speech. We disagree. Neither the Brammers' speech nor the speech involved in *Hajek* can be classified as commercial speech. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson*, 447 U.S. at 561. KB Home argues that the Brammers' speech relates "solely to their economic interest in their home and to influencing the economic decision of their audience on whether to buy a home from KB Home or some other homebuilder." However, the identity of the speaker is often crucial in determining whether speech is commercial speech. *Cf. Amalgamated Acme*, 33 S.W.3d at 394 (holding speech to be commercial speech where speaker, *a direct business competitor with applicant*, intended to end contractual relationships between applicant and his customers). This case, like *Hajek*, involves dissatisfied customers who are not engaged in any competing commercial activity but rather are attempting to inform the community that a business is profiting from defective products. Regardless

11

of the veracity of such disparagement, the criticism of the business can be reasonably related to social views that are strongly held by the speakers. Here, the Brammers spoke as members of a group advocating legislation to protect buyers of new homes from unscrupulous homebuilders, which arguably is an issue of public concern.

We also reject KB Home's attempt to independently rest the temporary injunction on its breach-of-contract claim. We recognize that "circumstances can arise in which a temporary injunction is appropriate to preserve the status quo pending an award of damages at trial." *Walling*, 863 S.W.2d at 58; *see also Universal Health Servs.*, 24 S.W.3d at 577 n.5, 578 (rejecting argument that injunction never appropriate remedy for breach of contract claim even where money damages available to compensate for claim); *Garth v. Staktek Corp.*, 876 S.W.2d 545, 550 (Tex. App.—Austin 1994, writ dism'd w.o.j.) (injunction against trade secret violations often necessary to provide meaningful legal protection to owners of intellectual property because monetary compensation not always sufficient to protect creator of new product from unfair competition); *Martin v. Linen Sys. for Hosps., Inc.*, 671 S.W.2d 706, 710 (Tex. App.—Houston [1st Dist.] 1984, no writ) (temporary injunction appropriate in breach of non-competition covenant case because "[a] dollar value cannot easily be assigned to a company's loss of clientele, goodwill, marketing techniques, office stability, etc."). Nonetheless, KB Home has not referred us to, nor have we located, a Texas case upholding a temporary injunction to enforce a contract like the one at issue here: a contract not to defame or disparage on issues that, arguably, are of social concern.

Here, as ultimate relief on its breach of contract claim, KB Home asks for actual and consequential damages sustained *as a result of* the Brammers' public comments and disparagement,

12

as well as a permanent injunction to enforce the Agreement. But KB Home failed to adduce any evidence at the temporary injunction hearing tending to show that the injury suffered as a result of the Brammers' breach of the agreement not to defame or disparage KB Home amounts to an injury different from that normally suffered as a result of defamation or business disparagement. Given that a remedy must be determined by the harm suffered, we do not find that KB Home's evidence of probable interim injury rises to the unique circumstances necessary to justify a temporary injunction pending an award of damages at trial. *See Walling*, 863 S.W.2d at 58.

Finally, KB Home argues that the Brammers waived their constitutional protection against prior restraint by entering into the Agreement. As we will discuss in detail below, we are unwilling to hold that, for purposes of this temporary injunction, the Brammers clearly waived their constitutional rights. Thus, this case is controlled by the basic rule in *Hajek* that equity, in the absence of independent grounds of equitable jurisdiction, lacks the power to issue an injunction restraining defamatory or disparaging speech. *See Hajek*, 647 S.W.2d at 255.

### 2. Waiver

KB Home takes the position that it has a probable right to recover a permanent injunction enforcing the Agreement against the Brammers because, as a matter of law, by signing the Agreement the Brammers contracted away their First Amendment rights, *i.e.*, the right to be free from prior restraint. KB Home relies on two cases that, it argues, implied a waiver of speech rights in order to uphold a temporary injunction. Although we are willing to assume for present purposes that the right to speak freely can be waived, we reject the position that Texas courts will find waiver

13

by implication.[3]  The United States Supreme Court has not articulated a settled standard for determining whether a civil litigant has waived his or her free speech rights, but in a case where the Court refused to find that a defendant had waived his right to make a First Amendment defense to a libel claim, it stated that "where the ultimate effect of sustaining a claim of waiver might be an imposition on that valued freedom, we are unwilling to find waiver in circumstances which fall short of being clear and compelling."  *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 145 (1967).  In *Fuentes v. Shevin*, the Court said that "a waiver of constitutional rights in any context must, at the very least, be clear."  407 U.S. 67, 95 (1972).  KB Home's assertion that Texas courts can imply waiver thus squarely conflicts with United States Supreme Court assertions on the matter.

---

[3] KB Home cites *Henderson v. KRTS, Inc.*, 822 S.W.2d 769 (Tex. App.—Houston [1st Dist.] 1992, no writ) and *South Atlantic & Gulf Coast District of the International Longshoremen's Ass'n v. Producers Grain Corp.*, 437 S.W.2d 33 (Tex. Civ. App.—Corpus Christi 1969, no writ), to support its argument that waiver can be implied.  Both cases are distinguishable.

In *Henderson*, the parties entered into an agreement whereby the defendant agreed to assist the applicant radio station to relocate to another city.  *Henderson*, 822 S.W.2d at 772.  In upholding a temporary injunction that enforced the agreement to assist, the court of appeals did not address whether the defendant had waived his free speech rights but instead stated that the injunction was limited so as not to infringe on free speech rights.  *Id.* at 775-76.

In *South Atlantic*, an employer obtained a temporary injunction that enjoined officers and members of a union from picketing and striking in violation of a no-strike provision in a collective bargaining agreement.  *South Atl.*, 437 S.W.2d at 34.  The court of appeals held that the injunction was not an unconstitutional prior restraint because, in light of the National Labor Relations Act, picketing that had as its object the inducement of a violation of a collective bargaining agreement was unlawful and thus not entitled to First Amendment protection.  *Id.* at 37.  The court found that the picketing fell within a narrow line of United States Supreme Court precedent that established "an unlawful objective test in cases involving picketing and the free speech protection."  *Id.* (discussing *Carpenters & Joiners Union v. Ritter's Café*, 315 U.S. 722 (1942)).  KB Home does not argue that the Brammers sought to achieve an unlawful objective by participating in the picketing against KB Home's business practices.

14

According to KB Home, the enforcement of contracts is "paramount public policy" in Texas, and an "injunction is proper to enforce contract rights even when one of the parties claims that its right to free speech is being violated." We disagree. In the words of the Texas Supreme Court: "Our state constitution requires that [courts] enforce its stringent preference for freedom of expression even for those who advocate interference with other constitutional rights." *Ex parte Tucci*, 859 S.W.2d 1, 7 (Tex. 1993). Free speech rights are the heart of our democratic system and involve not only the right of the individual to speak freely, but also the citizenry's interest in public discourse. Thus, if free speech rights can be waived in Texas,[4] a court must find clear and convincing evidence that the waiver is knowing, voluntary and intelligent. *See, e.g.*, *Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993) (holding that United States Supreme Court requires clear and convincing evidence that waiver is knowing, voluntary, and intelligent). Although the Brammers signed an agreement not to "complain or disparage the building quality or practices of KB Home," KB Home presented no evidence at the temporary injunction hearing to show that when the Brammers signed the Agreement they knowingly, voluntarily, and intelligently agreed to waive the constitutional safeguards implicated by defamatory or disparaging speech. The Brammers themselves never testified at the temporary injunction hearing.

---

[4] Although it seems clear from United States Supreme Court precedent that First Amendment rights can be waived, the Texas Supreme Court has said that article I, section 8 of the Texas Constitution provides greater protection of speech than its federal counterpart. *See, e.g.*, *Davenport*, 834 S.W.2d at 8-9; *Ex parte Tucci*, 859 S.W.2d 1, 5 (Tex. 1993). However, the scope of this greater protection has been questioned. *See Operation Rescue-Nat'l v. Planned Parenthood of Houston & Southeast Tex., Inc.*, 975 S.W.2d 546, 558-60 (Tex. 1998). For purposes of resolving this interlocutory appeal, we will not go so far as to say that free speech rights can *never* be waived in Texas.

If the applicant's allegations fail to present a valid legal theory to support a probable right to recover, a temporary injunction will be improper. *See Tenet Health Ltd. v. Zamora*, 13 S.W.3d 464, 472 (Tex. App.—Corpus Christi 2000, pet. dism'd w.o.j.). Here, because we cannot imply that the Brammers waived their free speech rights, we conclude that KB Home has failed to present a valid legal theory for its argument that as a matter of law the temporary injunction does not constitute a prior restraint.[5] We hold that the district court had no discretion to grant the temporary injunction based on its finding of probable injury because those portions of the injunction designed to remedy the injury violate constitutional guarantees. Accordingly, the district court's order is modified to delete paragraphs (a), (b), and (f).

### Restrictions on Content-Neutral Speech

Paragraphs (c), (d), and (e) of the temporary injunction create content-neutral restrictions on the Brammers' speech on the basis that the Brammers picketed using bullhorns and that Andrew Brammer "physically threatened and verbally abused [KB Home]'s employees, actual customers and prospective customers." The district court found that a buffer zone would serve "significant governmental interests such as maintaining public safety and order, including the psychological and physical well-being of [KB Home]'s employees, and actual and prospective customers; and [KB Home]'s private property interests." After reviewing the evidence, we conclude

---

[5] KB Home is not altogether precluded from seeking injunctive relief to enforce the Agreement following a trial on the merits. Because a careful, fact-intensive examination of the terms of the Agreement and the intent of the parties, as well as other issues, will be conducted at trial, it follows that it must be at trial where the Brammers *could* be found by clear and convincing evidence to have contracted away their free speech rights.

that the buffer zone is unconstitutional. However, we will let stand, with slight modifications, the other content-neutral restrictions on the Brammers' participation at the demonstrations.

### 1. Requirements for restricting content-neutral speech

A prerequisite for injunctive relief is the threat of imminent harm, which is a legal determination resting with the court. *Operation Rescue-Nat'l v. Planned Parenthood of Houston & Southeast Tex., Inc.*, 975 S.W.2d 546, 554 (Tex. 1998). An injunction restricting content-neutral speech complies with the First Amendment and article I, section 8 of the Texas Constitution if, under the circumstances, it burdens no more speech than necessary to serve a significant government interest. *Id.* at 557, 560. The record must contain evidence supporting each injunctive provision. *Id.* at 560. "A trial court's discretion in fashioning the details of an injunctive provision does not extend to determining whether particular kinds of relief are justified." *Id.* The record must reflect the need for the injunction at each location where conduct is enjoined, and the evidence must support both the kind of relief granted and the specific restrictions at each location. *Id.* at 560-61.

### 2. Buffer zone

The Brammers contend that the temporary injunction violates their freedom of expression by creating "an impermissible uniform exclusion and buffer zone." Paragraph (c) enjoins the Brammers from coming within seventy-five feet of KB Home's offices, model homes, or construction sites. It is recognized that "[a]ccommodating interests like property and privacy rights along with free expression often necessitates limitations on all of them." *Id.* at 555. "The right to

17

speak does not carry with it a duty on the part of the hearer to listen." *Id.* However, to protect KB Home's property rights and the privacy rights of its employees and customers against unwanted speech by creating a buffer zone, there must be evidence that such injunctive relief burdens no more speech than necessary at each specific location. *Id.* at 562.

To justify creating the buffer zone, KB Home presented testimony that the Brammers and other HOBB demonstrators congregated in the street or on the public sidewalks outside the sales offices at various subdivisions where they picketed with HOBB signs, chanted anti-KB Home slogans, accosted approaching vehicles, distributed leaflets, and showed pictures to customers approaching the sales offices. According to Oglesby, the Brammers had appeared at demonstrations at KB Home's Arroyo Ranch subdivision and Steeple Chase subdivision. Jennifer Ritz, a KB Home salesperson, testified that she saw the Brammers demonstrating at the Springfield Village subdivision. Oglesby testified that, while picketing, Andrew Brammer identified several KB Home employees by first name when he saw them. However, when asked, police officers stated that this conduct was not illegal because no last name identification was made. Oglesby further testified that the Brammers often stood at the end of a sidewalk leading into KB Home's sales office and confronted customers who walked from the street to the sales office. Oglesby admitted that the demonstrations had never been violent, only very loud and boisterous. Although the police have been called out on several occasions, no report has been made, no complaint accepted, and no arrests made.

Tanya Vargas, also a KB Home salesperson, testified that when she arrived at the Steeple Chase sales office the Brammers and others would yell through bullhorns that she should be

18

ashamed of herself for selling "broken" homes. She testified that they often jumped out in front of cars or accosted customers approaching the sales office to show them pictures or hand out leaflets. She testified that she had seen both Andrew and Yolanda Brammer using a bullhorn and that they could be heard even while in the sales office. Vargas also described in detail an incident in which Andrew Brammer followed her and some customers to a model home, all the while chanting through the bullhorn. As a result, one of the customers told Vargas that she did not feel that the neighborhood would be a safe place to raise a family. After showing the model home, Vargas attempted to leave in her car, but Andrew Brammer stood next to the driver's door while another demonstrator, holding a child, stood behind Vargas's vehicle to prevent her from reversing. Andrew Brammer then leaned over and, using the bullhorn, shouted anti-KB Home slogans at Vargas through the sun roof of her car. She testified that she was "freaked out" and "shaken." On another occasion, while parked outside the sales office of one subdivision, Andrew Brammer set off the alarm on his truck and then danced about, chanting slogans. According to Vargas, people living in the subdivision could hear Andrew Brammer's truck alarm. Vargas also testified that she had seen Andrew Brammer waiting around in his truck at night after the sales office had closed. This made her nervous and fear for her safety.

The evidence fails to demonstrate that a *complete* buffer zone at any KB Home site is necessary to further governmental interests in protecting property and privacy rights. These interests can be adequately protected by less burdensome means, such as those provided for by paragraphs (d) and (e), which prohibit the Brammers from blocking the public roadways or sidewalks and from shouting, yelling, or using bullhorns, auto horns, or other sound amplification equipment.

19

There is no evidence that the Brammers prohibited customers from accessing the subdivisions or the sales offices. Nor is there evidence that the Brammers trespassed on KB Home property. The record is clear that the police, who were often present at the demonstrations, never issued any citations or made arrests. There is no evidence that Yolanda Brammer's *conduct* ever threatened or harassed KB Home's employees and customers. Protecting the health and safety of KB Home's employees and customers is a legitimate state interest that justifies limitations on threatening conduct, "[b]ut the threat must come from the demonstrators' conduct and not merely from their speech." *Operation Rescue*, 975 S.W.2d at 564. To the extent that Andrew Brammer's conduct was threatening and harassing, the injunction contains a specific provision enjoining him from "verbally or physically threatening or verbally abusing any of [KB Home]'s employees, actual customers or prospective customers." Thus, the complete buffer zone created in paragraph (c) burdens more speech than necessary by proscribing peaceful conduct. *See id*.

### 3. Evidence supports the other content-neutral restrictions

Constitutional protection of the rights of free speech and assembly does not license obstruction of public ways or entrances to and exits from places of business. *See Tucci*, 859 S.W.2d at 4 (citing *Ex parte Pierce*, 342 S.W.2d 424, 427 (Tex. 1961)). Here, there was enough testimony for the district court to find reasonably necessary the injunctive provision in paragraph (d), which prohibits the Brammers from blocking the public roadways and sidewalks within 600 feet of KB Home property sites. Paragraph (d) also seems necessary to protect against incidents like the one described by Vargas, in which Andrew Brammer and another demonstrator prevented her from

20

moving her vehicle. To the extent that 600 feet may seem too great a distance, we defer to the district court's reasonable assessment of the number of feet necessary to keep access clear. *See Operation Rescue*, 975 S.W.2d at 560. On the other hand, the restrictions in paragraph (d) should be limited to the KB Home subdivisions of Steeple Chase, Arroyo Ranch, and Springfield Village; there was no evidence presented that the Brammers demonstrated at other KB Home sites. *Id*. at 560-61.

We also uphold the injunctive provision in paragraph (e), which enjoins the Brammers from "shouting, yelling, using bullhorns, auto horns . . . when demonstrating in the allowed buffer zone." There was ample evidence that the demonstrations were excessively loud, to the point that the demonstrators disrupted the privacy of KB Home's employees and customers while inside their offices and homes. The noise constraint is also necessary to protect the privacy of the homeowners in the subdivisions. We reiterate that "the right to speak does not carry with it a duty to listen." *Id*. at 569. However, because there is no evidence that the Brammers were present at KB Home sites other than the three subdivisions already listed, the noise constraints must be limited to those specific locations. *Id*. at 560-61. Also, because we do not uphold the buffer zone, the inclusion of the phrase "in the allowed buffer zone" in paragraph (e) is unnecessary and will be deleted.

**CONCLUSION**

We uphold the injunctive provisions in paragraphs (d) and (e) of the district court's order, but modify them to enjoin the Brammers only in the Arroyo Ranch, Steeple Chase, and

Springfield Village subdivisions. We also uphold in its entirety the provision that separately enjoins Andrew Brammer from engaging in threatening or abusive conduct towards KB Home's employees and customers. We delete paragraph (c) of the district court's order because it burdens more speech than necessary to serve other significant government interests and therefore violates the Brammers' constitutional rights of free expression. Because we do not uphold the buffer zone, we modify the order to delete the phrase "in the allowed buffer zone" from paragraph (e). Finally, we modify the order to delete paragraphs (a), (b), and (f) because these injunctive provisions are directed at enjoining speech based on content and, therefore, constitute an unconstitutional prior restraint. As modified, the district court's order is affirmed.[6]

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Modified and, as Modified, Affirmed

Filed: July 24, 2003

---

[6] Because we do not dissolve the temporary injunction, we do not expressly sustain any of the Brammers' issues. However, because we modify the order to delete those portions enjoining speech based on content, we implicitly sustain the Brammers' second and third issues. We also implicitly sustain the Brammers' fourth issue insofar as we modify the order to delete portions of the content-neutral provisions. In doing so, we need not further address the Brammers' remaining issues or arguments.