# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-25-00066-CV

---

**Dan Debin and Jackie Debin, Appellants**

**v.**

**Ashby Signature Homes, LLC; Norman Ashby; and LCD Lending, LLC, Appellees**

---

### FROM THE 395TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 23-0844-C395, THE HONORABLE RYAN D. LARSON, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

In this interlocutory appeal, Dan and Jackie Debin challenge the trial court's denial of their application for a temporary injunction. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(4). For the following reasons, we affirm the order denying the temporary injunction.

### BACKGROUND[1]

In May 2023, the Debins filed a Verified Application for Temporary Injunction and for Orders in Furtherance of Arbitration. Therein, they pleaded that in October 2020, they paid Ashby Signature Homes, LLC (Ashby Homes) a $25,000 deposit on a lot in the Southlake Ranch Subdivision in Georgetown, Texas (the Property) with the intention that Ashby Homes

---

[1] The facts recited in this section derive from the evidence admitted at the temporary-injunction hearing, viewed in the light most favorable to the trial court's ruling and with every reasonable inference indulged in the ruling's favor. *See Brammer v. KB Home Lone Star, L.P.*, 114 S.W.3d 101, 105–06 (Tex. App.—Austin 2003, no pet.).

build a custom home for them thereon. The Debins signed a "Lot Reservation Agreement" (Reservation Agreement) with Ashby Capital Investments, L.L.C. (Ashby Capital) on October 2, 2020. The Reservation Agreement provided that Ashby Capital ("Owner") intended to develop certain described acreage "into residential lots [Lots]" and to "utilize its affiliate" Ashby Homes ("Builder") "to build single family residences on the Lots for sale to the public." The Reservation Agreement acknowledged Ashby Capital's receipt of a $25,000 check ("Reservation Fee") from the Debins (together identified as the "Place Holder") "to obtain a right to purchase a residence or Lot at such time as they are available." The Reservation Agreement further provided the following:

> The Reservation Fee allows Place Holder to select the location of his/her/their Lot, subject to the terms of this document. **This document is NOT a contract for sale of any real estate or other improvements on the Property and is not to be construed as negotiation for the sale or transfer of any property right.** It is solely a good faith deposit establishing the right of Place Holder to make selections to purchase a Lot or residence, when and if they become available in the future.

> . . .

> At such time as Owner is able to accept binding agreements to purchase a Lot or residence, Owner shall notify the Place Holder . . . and Place Holder shall have ten (10) business days in which to elect to: (a) enter into either a Lot purchase agreement or (b) enter into an agreement for Builder to construct a residence for Place Holder.

> . . .

> In either a Lot purchase o[r] residence purchase, the Reservation Fee shall convert to earnest money at the time a definitive agreement is signed, and such earnest money shall be applied toward the purchase price at closing.

> In the event Place Holder either fails to make an election or makes an election and the parties are unable to timely enter into a definitive agreement, Owner shall refund Place Holder's Reservation Fee, less $20,000, which shall be retained by Owner.

In March 2021, the Debins entered into a "New Home Purchase Agreement" (Purchase Agreement) whereby the Debins agreed to pay Ashby Homes ("Builder") $965,000 for a specified lot in the above-identified subdivision, "together with all improvements to be constructed according to the Contract Documents." The "Total Home Price" of $965,000 was adjusted down in the Purchase Agreement to $940,000—due to the "lot hold deposit" of $25,000—for a total "Contract Sales Price" of $940,000, less a down payment received of $450,000, resulting in a "Remainder Owed" of $490,000, with a payment draw schedule to be agreed upon by the parties.

The Purchase Agreement provides that Ashby Homes "shall set the final closing date of the sale and purchase of the Property based upon the final completion date." It further provides,

> Every effort will be made by the Builder to close on schedule, but Owner [the Debins] and Builder agree that Owner will not rely on any closing or completion estimate by Builder for a "moving day" or any other commitment by Owner to any third party.
>
> . . .
>
> Should Owner fail or refuse to carry out Owner's obligations under this Contract, Builder may, at its option, (1) terminate this Contract and keep all Deposits as liquidated damages and each party shall be released of any further obligations of this Contract, (2) seek specific performance of this Contract and retain all Deposits, or (3) seek such other relief as may be provided by law. The pursuit of one remedy by Builder shall not prohibit Builder from electing, at any time, any other remedy. Should Builder fail or refuse to carry out Builder's material obligations under this Contract, Owner's exclusive remedy is to terminate this Contract and recover monies actually paid by Owner to Builder under this Agreement.

The Debins allege that the construction proceeded "extremely slowly" and remains incomplete and behind schedule. They further allege that after they paid their $450,000

3

up front, Ashby Homes began asking them for additional draws, some of which they have paid. Mrs. Debin testified that she and her husband have paid Ashby Homes a total of $800,000 towards the home purchase. The Debins admit that they have not paid the full purchase price under the Purchase Agreement. However, they allege that they have incurred substantial out-of-pocket costs, including for renting a house while construction is ongoing, and that Ashby Homes has attempted to charge them "additional exorbitant amounts through fraudulent change orders." Mrs. Debin testified that "all of a sudden" she and her husband started receiving change orders from Ashby Homes, with the Ashby Homes representatives telling them that "everything costs more than we had originally stated" and that the Debins needed to pay more because of increases in materials costs. The Debins paid some but not all of the change-order draws requested by Ashby Homes. Eventually, in February 2023, as Mrs. Debin testified, an Ashby Homes employee told her that "things aren't going to get done" and that they would have to pay the subcontractors themselves but should first ask Ashby Homes for the deed to the Property, which they should obtain before they "put any more money" into the Property.

Mrs. Debin testified that after a neighbor who was also having a home built by Ashby Homes informed her that some "investors were going to foreclose" on their property, the Debins went to the County Clerk's office and discovered that an "investor" had a $700,000 lien on "their" Property and that, therefore, Ashby Homes could not transfer title to them. Mrs. Debin testified that construction on the home has not been finished and that no certificate of occupancy has been issued.

The Debins allege that they have made numerous efforts to resolve their disputes amicably, including requesting that Ashby Homes transfer the deed to the Property to them so that they may hire their own contractors to complete the project. They were "shocked to

4

discover" that Ashby Homes "cannot deed the Property to them" because Ashby Homes "used the Property as collateral for an unrelated $700,000 loan from Defendant LCD Lending, LLC taken out over a YEAR after the Debins contracted for the Property." The Debins allege that LCD Lending "has refused to release its lien on the Property" and that Ashby Homes "is in default on its loan from LCD Lending." They allege that they are at risk of losing the Property due to foreclosure by LCD Lending because of Ashby Homes' and Norman Ashby's wrongful actions and inactions.

A representative for LCD Lending testified that in March 2022, LCD Lending made a $700,000 purchase-money loan to finance Ashby Homes' purchase of the Property from Ashby Capital, to pay off some liens on the Property, and to help fund construction costs. The representative testified that Ashby Homes had not made payments on the loan since March 2023 and that LCD Lending was preparing to foreclose. When LCD Lending made the loan to Ashby Homes, the representative was unaware whether construction had begun but understood that construction was planned. The representative testified that LCD Lending closed on the loan with Ashby Homes by using a title company, as they always do, and his understanding was that LCD Lending had a first lien on the Property and was entitled to foreclose. Another LCD Lending representative testified that the loan's maturity date was one year after the loan closed. She testified as to several documents admitted into evidence related to LCD Lending's loan and explained that LCD Lending required the prior liens on the Property to be released before closing on the loan so that LCD Lending would have clear title and be the "first lienholder." Among the documents admitted was a warranty deed transferring the Property from Ashby Capital to Ashby Homes on March 29, 2022.

In their application for a temporary injunction, the Debins allege that they initiated arbitration against Ashby Homes, Norman Ashby, and LCD Lending, asserting in the arbitration proceeding "a suit to quiet title and claims of fraud, deceptive trade practices, breach of contract, and violations of the Texas Construction Trust Fund Act," and seeking clear title to the Property, damages, and declaratory relief. In their application for temporary injunction, the Debins stated that although "at this time" they do not assert wrongdoing by LCD Lending, they are "including it as a necessary party to the suit to quiet title." They seek to enjoin Ashby Homes, Norman Ashby, and LCD Lending from selling, encumbering, damaging, or destroying the Property while the arbitration proceeding is pending. In their live petition—their first amended petition, filed about a month after the hearing on their application for a temporary injunction—the Debins reassert their request for a temporary injunction and assert two causes of action: a suit to quiet title and a claim against LCD Lending for tortious interference with an existing contract. After the January 4, 2025 hearing on the Debins' application for a temporary injunction, the trial court signed the subject order denying the application, and the Debins appeal.

**DISCUSSION**

In their first two issues, the Debins contend that the trial court abused its discretion in denying their application for temporary injunction because they demonstrated the three requisite elements to obtain a temporary injunction with respect to their quiet-title action, and in their third issue they argue that the trial court's denial of their application "effectively decided the merits of the case and granted relief to [LCD Lending] beyond the scope of the temporary injunction denial."

Whether to grant or deny a temporary injunction rests within the trial court's sound discretion. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). We review a trial court's decision to grant or deny a temporary injunction for an abuse of discretion. *Id.* A trial court abuses its discretion when it rules without reference to guiding rules and principles or when its decision is unreasonable or arbitrary. *Transcor Astra Grp. S.A. v. Petrobras Am., Inc.*, 650 S.W.3d 462, 482 (Tex. 2022). We view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary as to exceed the bounds of reasonable discretion. *Brammer v. KB Home Lone Star, L.P.*, 114 S.W.3d 101, 105 (Tex. App.—Austin 2003, no pet.). Our review of the trial court's decision is limited to the validity of its temporary-injunction order, i.e., whether there has been a clear abuse of discretion in granting or denying the temporary injunction; otherwise, we do not consider the merits of the underlying case. *Davis v. Huey*, 571 S.W.2d 859, 861–62 (Tex. 1978). When, as here, no findings of fact or conclusions of law were filed, the trial court's order must be upheld on any legal theory supported by the record. *Id.* at 862.

A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Butnaru*, 84 S.W.3d at 204. To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Id.* We begin by considering whether the Debins established the second element, as our conclusion thereon is dispositive of the Debins' first two issues.

To establish a probable right to recover, an applicant "must plead a cause of action and present some evidence that tends to sustain it," and the applicant's "evidence must be sufficient to raise a bona fide issue as to appellant's right to ultimate relief." *See Stewart Beach*

7

*Condo. Homeowner's Ass'n v. Gili N. Prop Invs., LLC*, 481 S.W.3d 336, 346 (Tex. App.—Houston [1st Dist.] 2015, no pet.). In resolving the Debins' first two issues, therefore, we consider whether they presented some evidence that tended to support their right to recover under their claim to quiet title. *See SBI Invs., LLC v. Quantum Materials Corp.*, No. 03-17-00863-CV, 2018 WL 1191854, at *5 (Tex. App.—Austin Mar. 8, 2018, no pet.) (mem. op.).

A suit to quiet title is an equitable remedy intended to clarify ownership and remove any cloud of title on the property. *Doty v. Davidson*, No. 04-20-00583-CV, 2022 WL 2334547, at *6 (Tex. App.—San Antonio June 29, 2022, pet. denied) (mem. op). To prevail in a suit to quiet title, a plaintiff must prove (1) he has an interest in a specific property; (2) title to the property is affected by a claim by the defendant; and (3) the defendant's claim, although facially valid, is invalid or unenforceable. *Id.* A suit to quiet title relies on the invalidity of the defendant's claim to the property, but a plaintiff can recover only on the strength of his or her *own* title, not on the weakness of the defendant's title.[2] *Id.* The plaintiff has the burden of supplying the proof necessary to establish his superior equity and right to relief. *Id.* That is, "the plaintiff must prove, as a matter of law, right, title, or ownership in himself with sufficient certainty to enable the court to see that he has a right of ownership and that the alleged adverse claim is a cloud on the title that equity will remove." *Hahn v. Love*, 321 S.W.3d 517, 531 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A suit that seeks to resolve a title

---

[2] Because the Debins may recover only on the strength of their own title, and not on the weakness of LCD Lending's claim to title, our analysis regarding whether they have a probable right to relief regarding their title claim applies equally to their assertion—for the first time on appeal—of "the affirmative defense of [LCD Lending]'s unclean hands" in arguing that their rights to the Property are superior to LCD Lending's. Additionally, the Debins' attempt to assert this affirmative defense at this procedural point is improper. *See, e.g.*, *Louison v. Caddette*, No. 01-22-00034-CV, 2024 WL 5249158, at *5 (Tex. App.—Houston [1st Dist.] Dec. 31, 2024, pet. denied) (mem. op.) (failure to plead affirmative defense constitutes waiver thereof); Tex. R. Civ. P. 94; Tex. R. App. P. 33.1.

8

dispute is, in effect, an action in trespass to try title, whatever its form. *See Brumley v. McDuff*, 616 S.W.3d 826, 832, 836 (Tex. 2021) (noting that trespass-to-try-title action "embraces all character of litigation that affects the title to real estate" (quoting *Stanolind Oil & Gas Co. v. State*, 133 S.W.2d 767, 770 (Tex. 1939))).

The Debins concede that they do not hold legal title to the Property, but they contend that they presented evidence of their "equitable title" to or "equitable interest" in the Property, which they claim is sufficient to demonstrate a probable right to quiet title in themselves. Equitable title is the *present* right to compel legal title. *Travis Cent. Appraisal Dist. v. Signature Flight Support Corp.*, 140 S.W.3d 833, 840 (Tex. App.—Austin 2004, no pet.); *see also Longoria v. Lasater*, 292 S.W.3d 156, 165 (Tex. App.—San Antonio 2009, pet. denied) (noting that equitable title is title that "indicates a beneficial interest in property and that gives the holder the right to acquire formal legal title"); *City of Houston v. Guthrie*, 332 S.W.3d 578, 588 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("'Equitable title' is a right, enforceable in equity, to have the legal title to real estate transferred to the owner of the right upon the performance of specified conditions."). The Debins have identified no evidence in the record supporting any *present* right they have to compel legal title to the Property. To the contrary, the Purchase Agreement expressly specifies that should Ashby Homes fail or refuse to carry out its material obligations thereunder—which is what the Debins allege has happened—the Debins' *exclusive* remedy is to terminate the agreement and recover the monies they have actually paid.

Additionally, per the Purchase Agreement, there is no date certain for a closing on the Property; rather, the closing date is expressly dependent on when Ashby Homes achieves "final completion" of the home construction. Until such final completion—which is within Ashby Homes' control—there can be no closing and, thus, no transfer of legal title. And should

9

Ashby Homes fail to bring the home to final completion, the Debins may only obtain the return of their monies paid, which remedy does not constitute a present right to compel legal title. Moreover, even were the Debins to tender the full purchase price—which they concede they have not done—they would still not have any right to compel legal title, as the Purchase Agreement effectively waives their right to seek specific performance by limiting their remedies to the return of monies paid. *Cf. Cullins v. Foster*, 171 S.W.3d 521, 533 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("Equitable title may be shown when the plaintiff proves that he has paid the purchase price and fully performed his obligations under the contract. Upon such performance, he becomes vested with an equitable title to the property which is sufficient to allow him to maintain his action in trespass to try title." (quoting *White v. Hughs*, 867 S.W.2d 846, 849 (Tex. App.—Texarkana 1993, no writ))).

The concept of equitable title generally arises in circumstances involving executory contracts or what are commonly known as "contracts for deed"—which in the real-estate context typically occur when a purchaser takes possession of property and makes payment installments over time. *See, e.g.*, *Cadle Co. v. Harvey*, 46 S.W.3d 282, 287 (Tex. App.—Fort Worth 2001, pet. denied) (noting that purchaser under executory contract who has gone into possession of property may assert that it has equitable title, which is superior to claims of third-party lienholders). These types of executory contracts usually provide a purchaser with equitable title to the property, superior to the seller's title, once the full contract price has been paid and any other contractual obligations have been met, but the purchaser does not acquire equitable title until that juncture; before that juncture, the purchaser is considered to have "equitable rights" in the property, which ripen into equitable title upon completion of payment and other obligations. *See Gaona v. Gonzales*, 997 S.W.2d 784, 787 (Tex. App.—Austin 1999,

10

no pet.); *see also Johnson v. Wood*, 157 S.W.2d 146, 148 (Tex. [Comm'n Op.] 1941) (noting that so long as purchaser under contract for deed had not "performed his covenants by the payment of the purchase price, he had but an equitable right, but upon his performance that right ripened into an equitable title superior to" that of seller); *Glenn v. Lucas*, 376 S.W.3d 268, 276 (Tex. App.— Texarkana 2012, no pet.) ("[T]he purchaser under a contract for conveyance of property does not acquire equitable title to the property until he pays the purchase price and fully performs the obligations under the contract."). Although the Purchase Agreement bears some resemblance to an executory contract, the Debins have never been in possession of the Property, and the Purchase Agreement expressly limits the Debins' rights and remedies, foreclosing their right to specific performance or to compel conveyance of legal title, even if they pay the full contract price, which they concede they have not. The caselaw the Debins cite in support of a purchaser's obtaining equitable title is thus inapplicable, and the Debins have identified no other applicable authority supporting their argument that they have "equitable title" to the Property. Likewise, the Debins' argument that they have "equitable rights" to the Property is to no avail with respect to whether they established a probable right to recover on their quiet-title claim. *See Gaona*, 997 S.W.2d at 787.

The Debins also contend on appeal that they have equitable title to the Property by virtue of the Reservation Agreement, which they argue constitutes evidence that they "paid the full purchase price for the land itself, which was all that existed as of that date." We disagree and conclude that the Reservation Agreement does not constitute any evidence supporting the Debins' probable right to relief on their quiet-title claim. The express language in the Reservation Agreement specifies that it is "NOT a contract for sale of any real estate or other improvements" and is "not to be construed as negotiation for the sale or transfer of any property

11

right." Rather, it signifies that the Debins have paid a largely non-refundable deposit for the "right" "to make selections to purchase a Lot or residence, when and if they become available in the future" and that the deposit will convert to earnest money if and when a "definitive agreement" is later reached for the Debins to purchase real property.

Accordingly, viewing the evidence in the light most favorable to the trial court's ruling, drawing all legitimate inferences from the evidence, and deferring to the trial court's resolution of conflicting evidence, we cannot conclude that the trial court abused its discretion in denying the Debins' application for temporary injunction. *See Six Bros. Concrete Pumping, LLC v. Tomczak*, No. 01-21-00161-CV, 2022 WL 17981577, at *3 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.).

Regarding the Debins' fourth issue—in which they contend that the trial court "granted relief beyond the scope of" merely denying their application for temporary injunction and erroneously decided the merits of the dispute—we first identify the challenged recital in the trial court's order: "Defendant LCD Lending, LLC shall be permitted to exercise its statutory and contractual rights with respect to the Property at issue in this case." But this recital does not constitute "relief" or decide the merits of the quiet-title claim because it is a mere acknowledgment that LCD Lending may exercise whatever statutory and contractual rights with respect to the Property it may have; it does not grant any such rights or even judicially declare what those rights may be. *Cf. Relief*, *Black's Law Dictionary* (12th ed. 2024) (defining "declaratory relief" as "judicial relief that pronounces upon the legal status or ownership of a thing" and "monetary relief" as "a court's award of damages"); *Remedy*, *Black's Law Dictionary* (12th ed. 2024) (defining "remedy" as "the means of enforcing a right or preventing or redressing a wrong; legal or equitable relief"). While the Debins correctly argue that the recital

12

is extraneous to the denial of their application, even assuming that the inclusion of the language in the order was error, the Debins have not argued or demonstrated how they have suffered or are likely to suffer any harm as a result. *See G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) (under harmless-error rule, to reverse judgment, reviewing court must find that error amounted to "such a denial of the appellant's rights as was reasonably calculated to cause and probably did cause 'the rendition of an improper judgment,' or that the error 'probably prevented the appellant from properly presenting the case [on appeal].'" (quoting Tex. R. App. P. 44.1(a)(1))); *see also id.* ("The [harmless-error] rule applies to all errors."). We overrule the Debins' fourth issue.

## CONCLUSION

Having determined that the trial court did not abuse its discretion in denying the Debins' application for temporary injunction, we affirm its order.

_____

Karin Crump, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed: August 7, 2025