**MARKETSHARE TELECOM, L.L.C., Appellant,**

v.

**ERICSSON, INC., Appellee.**

No. 05–05–01108–CV.

Court of Appeals of Texas, Dallas.

Aug. 15, 2006.

Clark B. Will, Michael D. Clark, Quilling, Selander, Cummiskey & Lownds, P.C., Dallas, W. Mark Montgomery, Waren C. Price, Parker & Montgomery, McKinney, for appellant.

Jim (James) McCown, Nesbitt, Vassar & McCown, LLP, Addison, for appellee.

Before Justices BRIDGES, FRANCIS, and LANG–MIERS.

## OPINION

Opinion by Justice LANG–MIERS.

This is an interlocutory appeal from a modified temporary injunction entered against appellant Marketshare Telecom, L.L.C. Marketshare argues four issues: (1) the temporary injunction is an unconstitutional prior restraint on Marketshare's rights to free speech; (2) the temporary injunction is an impermissible anti-suit injunction; (3) Ericsson did not prove a probable right to relief and probable harm; and (4) the court erred by denying its application for injunctive relief. We modify the temporary injunction and, as modified, affirm.

## BACKGROUND

This dispute centers on a February 4, 2004 Distribution Agreement between Marketshare and Ericsson, Inc. That agreement allowed Marketshare to sell Ericsson products and to sub-license the right to use Ericsson's trade name, logo, and software to its value-added resellers (VARs). It also gave Marketshare sixty days to pay for products it ordered.[1] Although the parties disagree about whether and how the terms of the Distribution Agreement were modified, they agree that during the summer of 2004, Marketshare delayed payments to Ericsson that were otherwise required by the Distribution Agreement. On November 30, 2004, Marketshare signed a letter acknowledging the delayed payments and paid the amounts due by the end of the year. During this same time period, Marketshare recruited and signed independent seller agreements with VARs and developed its business.

In December 2004, the parties talked about whether Marketshare would again delay payments in 2005. Marketshare claims that the parties orally agreed to modify the terms of the Distribution Agreement to allow Marketshare to delay the February and March 2005 payments so that it could use that money to expand its staff, and that it would resume payments in April, including paying $100,000 a month to pay off the unpaid February/March balance. As in 2004, Marketshare would pay the balance in full by the end of the year. Ericsson agrees that it had discussions about an agreement and

---

1. The parties refer to this as a credit arrangement and to a suspension of this arrangement as a credit hold.

that payments were delayed but denies it had that agreement.

In April and May 2005, Ericsson's agent, Adam Matsil, made a written proposal to Marketshare that established a due date for the 2005 unpaid balance. Marketshare refused to sign the proposal because it did not believe the proposal represented their agreement. Ericsson contended that after Marketshare refused to agree to the proposal, it had no choice but to stop extending further credit to Marketshare and, on June 20, 2005, it placed Marketshare on a credit hold. This effectively required Marketshare to pay for the products when it placed the orders rather than allowing it to pay over time. Marketshare responded with an e-mail acknowledging that Ericsson had the right to place it on credit hold and threatening to file for bankruptcy protection, stating that it could not pay if Ericsson put it on credit hold.

Thereafter, on July 8, 2005, Ericsson terminated the Distribution Agreement because it contends, at this point, it believed Marketshare's financial condition had deteriorated and that Ericsson was not going to get paid. Marketshare responded to the notice of termination by denying that Ericsson was entitled to terminate the Agreement and again threatening to file for bankruptcy protection.

After it sent Marketshare notice that it terminated the Distribution Agreement, Ericsson sent a letter to the VARs stating that they now had to obtain rights to use Ericsson trademarks or software or to sell products directly from Ericsson because the Distribution Agreement with Marketshare had been terminated, and Marketshare no longer had the right to sell Ericsson products or sub-license any Ericsson rights. Ericsson contends that, despite the notice of termination, Marketshare re-

fused to recognize that the Distribution Agreement had been terminated and continued to market and sell products in violation of Ericsson's rights. Ericsson claims that Marketshare sent a letter to the VARs that included false and disparaging statements about Ericsson. It complains that Marketshare told the VARs that the Distribution Agreement was still binding, that Ericsson had breached the agreement, that Marketshare was going to sue Ericsson and continue to sell Ericsson products, and that Marketshare intended to enforce its legal rights. Ericsson also complains that Marketshare set up a booth at a trade show using Ericsson's name and logo and marketing Ericsson products and that Ericsson also had a booth at the same show. Ericsson contends that Marketshare's communications with the VARs and its other conduct caused confusion in the marketplace.

On July 18, 2005, Ericsson filed an application for injunctive relief. Ericsson claimed, among other things, that it rightfully terminated the Distribution Agreement because Marketshare breached the Agreement. The trial court issued an *ex parte* temporary restraining order on the same date, which the parties agreed to modify on July 22, 2005.

On July 27, 2005, Marketshare sent an e-mail to the VARs telling them that they were obligated to buy products from Marketshare, not Ericsson, and that buying products from other sources, including from Ericsson, was a violation of the VARs' contracts with Marketshare.[2] Ericsson contends that this further confused customers because of their concern that they could not buy products directly from Ericsson without risking a lawsuit from Marketshare.

---

2. Marketshare claimed that it had an exclusive right to market certain Ericsson products. Ericsson contends that Marketshare no longer had that right because it had breached the Distribution Agreement and that Agreement had been terminated.

On July 28, 2005, Marketshare filed a first amended original answer, original counterclaim, and its own application for temporary injunction. Marketshare claimed that Ericsson did not have the right to terminate the Distribution Agreement because Marketshare had complied with the Agreement and that Marketshare was entitled to injunctive relief against Ericsson.

The trial court held a hearing on the parties' respective applications for temporary injunction. On August 2, 2005, the court issued a temporary injunction against Marketshare and denied Marketshare's application for temporary injunction. On August 9, 2005, the trial court issued the modified temporary injunction that is the subject of this appeal.

The modified temporary injunction enjoins Marketshare from misrepresenting the procedural or substantive status of the lawsuit; selling, marketing, distributing, or licensing Ericsson products, or representing that it will be able to do so in the future; using or infringing upon Ericsson's intellectual property rights; and interfering with Ericsson's current or prospective relationship with any VAR or filing suit against any VAR relating to the VAR's sale, licensing, marketing, or distribution of Ericsson's products on or after August 1, 2005.

## STANDARD OF REVIEW

We review a trial court's order granting or denying a request for a temporary injunction under an abuse of discretion standard. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002); *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993); *Loye v. Travelhost, Inc.* 156 S.W.3d 615, 618 (Tex.App.-Dallas 2004, no pet.).

The reviewing court must not substitute its judgment for the trial court's unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Butnaru,* 84 S.W.3d at 204 (*citing Johnson v. Fourth Ct. of App.*, 700 S.W.2d 916, 918 (Tex.1985)). In reviewing the trial court's decision, we draw all legitimate inferences from the evidence in the light most favorable to the trial court's judgment. *Tom James of Dallas, Inc. v. Cobb,* 109 S.W.3d 877, 883 (Tex.App.-Dallas 2003, no pet.); *Rugen v. Interactive Bus. Sys., Inc.,* 864 S.W.2d 548, 551 (Tex.App.-Dallas 1993, no pet.). The trial court does not abuse its discretion by making a decision based on conflicting evidence. *Tom James,* 109 S.W.3d at 883; *Rugen,* 864 S.W.2d at 551. However, the trial court does abuse its discretion when it misapplies the law to established facts or when the evidence does not reasonably support the trial court's determination of the existence of probable injury or probable right of recovery. *Tom James,* 109 S.W.3d at 883; *Rugen,* 864 S.W.2d at 551. We review de novo any determinations on questions of law that the trial court made in support of the order. *Tom James,* 109 S.W.3d at 883.

## PRIOR RESTRAINT OF FREE SPEECH

In its first issue, Marketshare argues that the modified temporary injunction is an impermissible gag order that violates Marketshare's right to free speech under the First Amendment of the United States Constitution and Article I, Section 8 of the Texas Constitution. Marketshare also argues that the language is impermissibly vague and violates Texas Rule of Civil Procedure 683.[3]

---

**3.** Rule 683 provides that:

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the

## The Modified Temporary Injunction

Marketshare complains about the portions of the modified temporary injunction that enjoin Marketshare from

- Misrepresenting the procedural status of this lawsuit or the terms of this Temporary Injunction (or any other Order or ruling entered by the Court) to the VAR's;
- Representing to the VAR's that [Marketshare]'s allegations in the lawsuit have been established in this lawsuit or accepted by the Court; ... [and]
- Representing or communicating to any of the VAR's that [Marketshare] either has or will obtain the right to license, re-license, assign, re-assign, convey, or re-convey Ericsson's products or intellectual property or trade name or logo, other than for the sale of Inventory.

## Constitutional Protection

The Texas Constitution provides that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege...." TEX. CONST. art. I, § 8. The Texas Supreme Court has interpreted Texas's constitutional right to free speech more broadly than its federal equivalent. *Davenport v. Garcia*, 834 S.W.2d 4, 8–9 (Tex.1992). We decide this issue under the Texas Constitution and do not need to reach this issue under the federal constitution.

## Prior Restraint

■■■ An administrative or judicial order that forbids certain communications before they occur constitutes a prior re-

parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

straint. *Alexander v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993). Prior restraints on speech are presumptively unconstitutional. *Davenport*, 834 S.W.2d at 10. The Texas Supreme Court has held that before the trial court may impose a gag order, it must make specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive the litigants of a just resolution of their dispute and that (2) the judicial action represents the least restrictive means to prevent that harm. *Davenport*, 834 S.W.2d at 10; *see also Ex parte Tucci*, 859 S.W.2d 1, 5–6 (Tex.1993).

■■■ Courts will modify a temporary injunction by deleting the language from the injunction that constitutes an unconstitutional prior restraint. In *Texas Mutual Insurance Company v. Surety Bank*, 156 S.W.3d 125 (Tex.App.-Fort Worth 2005, no pet.), the court deleted language from a temporary injunction, quoting from *Ex parte Tucker*, 110 Tex. 335, 220 S.W. 75, 76 (1920):

Simply put, it is generally unconstitutional for courts to require one to acquire permission to speak before speaking:

It has never been the theory of free institutions that the citizen could say only what courts or legislatures might license him to say, or that his sentiments on any subject or concerning any person should be supervised before he could utter them. Nothing could be more odious, more violative or destructive of freedom, than a sys-

Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought. The appeal of a temporary injunction shall constitute no cause for delay of the trial.

tem of only licensed speech or licensed printing.

*Tex. Mut. Ins. Co.*, 156 S.W.3d at 129 (quoting *Tucker*, 220 S.W. at 76).

■ Consequently, we begin with the presumption that a prior restraint is unconstitutional unless it meets the requirements of *Davenport*. There is nothing in the record that shows the parties discussed or presented evidence concerning whether the injunction was the least restrictive means to prevent the harm.[4] And although the trial court found that immediate and irreparable harm would result to Ericsson unless Marketshare was restrained, it did not find, as required by *Davenport*, "that an imminent and irreparable harm to the judicial process will deprive the litigants of a just resolution of their dispute and that the judicial action represents the least restrictive means to prevent the harm." As a result, the modified temporary injunction does not satisfy the requirements of *Davenport*.

### Restraints on Commercial Speech

■ Ericsson contends that the injunction prohibits commercial speech and that restraints on commercial speech are constitutional and permissible. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Some forms of regulation are permissible with commercial speech. *State Bd. of Med. Exam'rs v. Burzynski*, 917 S.W.2d 365, 370 (Tex.App.-Austin 1996, writ denied). But the courts may only restrain commercial speech that is false or misleading. *Cent. Hudson*, 447 U.S. at 566, 100

S.Ct. 2343; *Owens v. State*, 820 S.W.2d 912, 914 (Tex.App.-Houston [1st Dist.] 1991, pet. ref'd) (holding that "[i]ntentionally false or misleading statements made in a commercial context are not protected"). Courts may take measures to prevent deception and confusion even if the speech is not inherently misleading but only potentially misleading. *See Gonzalez v. State Bar of Tex.*, 904 S.W.2d 823, 829 (Tex.App.-San Antonio 1995, writ denied). But defamation alone is not a sufficient justification for restraining an individual's right to speak freely. *See Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex.1983). Ericsson argues that the first paragraph of the injunction that Marketshare challenges is a permissible restraint because commercial speech that is misleading or potentially misleading can be restrained, and the first paragraph of the injunction only restrains Marketshare from "misrepresenting." It claims that Marketshare cannot validly complain about being enjoined from misrepresenting.

Ericsson relies upon *Amalgamated Acme Affiliates, Inc. v. Minton*, 33 S.W.3d 387 (Tex.App.-Austin 2000, no pet.), in which employees of University Sports called between forty and fifty of the plaintiff's customers, provided false information to the customers, and urged them to withhold payments owed to the plaintiff. As a result, several customers stopped paying the plaintiff. *Id.* at 391. Employees of University Sports also called the plaintiff's customers, falsely identified themselves as the plaintiff, and provided false information to the customers. *Id.* Because University Sports intended that its speech would "end contractual relationships between [the plaintiff] and his customers, or

---

**4.** Ericsson argued at the hearing on the modified temporary injunction that the injunction provided a "limited" restraint on commercial speech, but Ericsson has raised for the first time on appeal the argument that the provisions restraining speech are the least restrictive means of preventing harm.

[ ] prevent contractual relationships with potential customers," the appellate court agreed that it was commercial speech. *Id.* at 394. The court explained that "[t]o enjoy any protection, commercial speech must not be false or misleading." *Id.* Because University Sports's speech was both false and misleading, the appellate court held that the trial court properly enjoined University Sports from repeating the same specific and fraudulent information to any more of the plaintiff's known present or potential customers. *Id.*[5]

■ Superficially, Ericsson's argument that a party should not complain that it is prohibited from making misrepresentations makes sense. But misrepresentations in commercial speech can only be restrained if, as in *Minton,* the applicant first establishes that commercial speech that was false and misleading has actually been uttered. We do not find support in the law for the position that a party can be generally prohibited from making misrepresentations without that type of proof. And as Marketshare argues, if the plaintiff does not establish that the speech at issue is false or misleading, the distinction between commercial and non-commercial speech does not matter. *See Tex. Mut. Ins. Co.,* 156 S.W.3d at 130.

Consequently, we must decide whether the court below imposed an unconstitutional prior restraint or whether the injunction is a permitted restraint on commercial speech. To do so, we must determine whether Ericsson established that false or misleading statements had been made that justify a restraint on commercial speech.

*Marketshare's Communications to VARS*

■ The evidence before the trial court included two communications from Marketshare to its VARs, a July 14, 2005 letter and a July 27, 2005 e-mail that Ericsson claimed justified the injunction. The July 14, 2005 letter, in salient part, reads:

We are compelled to tell you that [Marketshare] has done nothing to bring Ericsson's actions about. On the contrary, not only do we believe that [Marketshare's] business plan was sound, we have helped them build a significant base of Business Partners that represent the future in the marketplace. Furthermore, we also believe that we have a legally enforceable agreement with Ericsson and that their action is a breach of contract. We intend to fight for enforcement of our legal rights to continue to operate to serve you. We also believe that Ericsson has compounded matters, by their communication to you, by actively soliciting our Business Partners to do business directly with them. Again, we feel certain that this transgression will be rectified in the legal system. Ultimately, our legal right will be upheld and we will resume our business here. We can only hope that Ericsson's own highly questionable actions have not caused damage to the business that you and I have been working so hard here [sic].

The July 27, 2005 e-mail notes that "all we can confirm at this time is that we are attempting to amicably resolve our disputes with Ericsson." It also states:

---

**5.** University Sports was ordered to desist and refrain from communicating to customers and potential customers of the plaintiff that the plaintiff had committed fraud, made misrepresentations, engaged in a scam, violated any contract or law or similar conduct, from suggesting to customers or advertisers that they should not pay bills to the plaintiff, from representing itself as a representative of a school district that it does not represent, or from representing itself as a representative of the plaintiff.

That being said, [Marketshare] does want to remind you that your business has a contractual obligation to [Marketshare]. You will recall that this agreement had various provisions in it that require all [Marketshare] Business Partners to have all of their Ericsson orders filled from one source only—[Marketshare]. If you are buying Ericsson product from some other source, including Ericsson, whether for resell or for your own inventory, you are clearly in violation of our contract. Regardless of the circumstances, please be aware that any selling of Ericsson product, gained from this other source, is a violation of our Agreement.

Ericsson contends that Marketshare deceived Ericsson's customers by telling them that it was in compliance with the Distribution Agreement and it, not Ericsson, had the right to sell them Ericsson's products. Ericsson contends that the restraints on speech were permissible because they were narrowly tailored to prohibit Marketshare's false communications about the lawsuit and its ability to sell Ericsson's products and were the least restrictive possible to prevent imminent harm to Ericsson's good will and business reputation. It also contends that the challenged terms of the injunction were permissible because Marketshare is only prevented from making misrepresentations.

Marketshare contends that the communications that were challenged referred to its beliefs and its position in the lawsuit, which were not false or misleading and could not constitutionally be enjoined. It also argues that because the term "misrepresenting" is vague and overbroad, it restrains speech that is not false.

We conclude that regardless of whether Marketshare's communications with its VARs constitute commercial speech, Ericsson did not establish that the communications were deceptive, false, or misleading as was the case in *Minton*. The claims "[w]e are compelled to tell you that [Marketshare] has done nothing to bring Ericsson's actions about" and "[u]ltimately, our legal right will be upheld and we will resume our business here" potentially approach being misstatements because they assert as facts its position in the lawsuit and that there will be a specific outcome in the lawsuit. But in the context of the rest of the letter, in which Marketshare couches most assertions as belief or opinion, the statements are more statements of position rather than statements of fact. *See Tex. Mut. Ins. Co.*, 156 S.W.3d at 130 (declining to hold that a possible negative interpretation or impression of factually accurate words renders speech false or misleading). Additionally, the claim that VARS would violate agreements with Marketshare if they bought from Ericsson does not constitute a misrepresentation such as was addressed in *Minton*. As a result, Ericsson did not satisfy the requirements in *Minton* to justify a restraint on commercial speech.

We further conclude that the trial court abused its discretion by imposing an unconstitutional prior restraint without making the necessary findings under *Davenport*. As a result, we sustain Marketshare's point of error and delete the following provisions from the modified temporary injunction:

- Misrepresenting the procedural status of this lawsuit or the terms of this Temporary Injunction (or any other Order or ruling entered by the Court) to the VAR's [page three];

- Representing to the VAR's that [Marketshare]'s allegations in the lawsuit have been established in this lawsuit or accepted by the Court [page three];
 . . .

• Representing or communicating to any of the VAR's that Marketshare either has or will obtain the right to license, re-license, assign, re-assign, convey, or re-convey [Ericsson]'s products or intellectual property or trade name or logo, other than for the sale of inventory [page four].

## ANTI–SUIT INJUNCTION

In Marketshare's second issue, it complains that the injunction constitutes an impermissible anti-suit injunction because it enjoins Marketshare from:

Interfering with Ericsson's current or prospective relationship with any VAR that desires to directly contract with Ericsson to sell, license, market, or distribute Ericsson's products, *including a restraint on any lawsuit, whether for monetary damages or injunctive relief, against any VAR relating to that VAR's sale, licensing, marketing, or distribution of Ericsson's products on or after August 1, 2005.* This provision does not apply to any actions by Marketshare from the sale of the Inventory. Nothing herein shall prevent Marketshare from communicating with the VAR's for any accounts receivables or other contract rights or claims that Marketshare believes in good faith that it has against the VAR's, other than as set forth above.

[Emphasis added]. Marketshare particularly complains of the provision enjoining it from filing suit against the VARs. Ericsson argues that the provision properly prevents any threat to the trial court's jurisdiction and a multiplicity of lawsuits.

When a party files suit in a court of competent jurisdiction, that court is entitled to proceed to judgment and may protect its jurisdiction by enjoining the parties to a suit subsequently filed in another court of this state. *Gannon v.*

*Payne,* 706 S.W.2d 304, 305 (Tex.1986). Further, Texas courts are empowered to issue injunctions to prevent parties from going forward with litigation in a sister state. *Christensen v. Integrity Ins. Co.,* 719 S.W.2d 161, 163 (Tex.1986). Although courts of this state have the power to enjoin parties from filing or pursuing lawsuits in other states, the principle of comity requires that courts exercise this equitable power sparingly and only in very special circumstances. *See Golden Rule Ins. Co. v. Harper,* 925 S.W.2d 649, 651 (Tex.1996); *Christensen,* 719 S.W.2d at 163.

Generally, anti-suit injunctions are appropriate in four instances: (1) to address a threat to the court's jurisdiction; (2) to prevent the evasion of important public policy; (3) to prevent a multiplicity of suits; and (4) to protect a party from vexatious or harassing litigation. *Golden Rule,* 925 S.W.2d at 651. A party seeking such an injunction must establish that "a clear equity demands" the injunction. *Id.* A single parallel proceeding in a foreign forum does not constitute a multiplicity of suits and cannot, by itself, justify the issuance of an anti-suit injunction. *Id.* at 651–52; *Gannon,* 706 S.W.2d at 307.

Ericsson argues that there are twenty-five VARs that Marketshare could decide to sue in twenty-five different jurisdictions. It complains that any suit between Marketshare and its VARs "would necessarily infringe on the trial court's ruling in this case" and that a suit against the VARs could lead to inconsistent results. But there is nothing in this record that demonstrates that Marketshare has filed or actually threatened to file suits that would either threaten the trial court's jurisdiction or result in a multiplicity of suits that Ericsson would have to defend. At most, the evidence indicated that Marketshare *might* sue its VARs for purchas-

ing directly from Ericsson. Before an anti-suit injunction can properly issue, the requesting party must demonstrate that "very special circumstances" exist such that an injunction is necessary to prevent an "irreparable miscarriage of justice." *See Golden Rule,* 925 S.W.2d at 651; *Gannon,* 706 S.W.2d at 307. And Ericsson has not shown and the trial court did not find that the *Golden Rule* requirements were met or that very special circumstances exist to justify issuance of an anti-injunction suit. *Cf. AVCO Corp. v. Interstate Southwest, Ltd.,* 145 S.W.3d 257, 267 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (holding that additional filing of two parallel suits in Pennsylvania did not qualify as "multiple suits" under *Golden Rule* ); *see Am. Int'l Specialty Lines Ins. Co. v. Triton Energy Ltd.,* 52 S.W.3d 337, 343 (Tex.App.-Dallas 2001, pet. dism'd w.o.j.) (finding very special circumstances existed where insurer violated policy clause by filing suit in California).

As a result, we conclude that the trial court abused its discretion in issuing the anti-suit injunction. We sustain Marketshare's second point of error and delete the following provision from the modified temporary injunction:

> ... including a restraint on any lawsuit, whether for monetary damages or injunctive relief, against any VAR relating to that VAR's sale, licensing, marketing, or distribution of Ericsson's products on or after August 1, 2005 [page four].

## PROBABLE RIGHT TO RELIEF AND PROBABLE INJURY

In its third issue, Marketshare claims that Ericsson failed to prove a probable right to relief and probable injury to justify the issuance of an injunction. To determine whether the court erred, we must determine whether Ericsson met its burden on its claims of breach of contract, interference and infringement, and business disparagement.

### Purpose of the Temporary Injunction

The purpose of a temporary injunction is to preserve the status quo of the subject matter of the litigation pending a trial on the merits. *Butnaru,* 84 S.W.3d at 204; *Rugen,* 864 S.W.2d at 550; *Elec. Data Sys. Corp. v. Powell,* 508 S.W.2d 137, 139 (Tex.Civ.App.-Dallas 1974, no writ). To obtain a temporary injunction, the applicant must plead and prove (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Tom James,* 109 S.W.3d at 882 (*citing Butnaru,* 84 S.W.3d at 204); *see Walling,* 863 S.W.2d at 57. At a temporary injunction hearing, the trial court considers whether the applicant has shown a probability of success and irreparable injury; the parties do not present the underlying merits of the controversy. *Loye,* 156 S.W.3d 615, 619.[6] A reviewing court will reverse a temporary injunction order only if the record shows a clear abuse of discretion. *See Tom James,* 109 S.W.3d at 883 (citing *Rugen,* 864 S.W.2d at 550–51).

### Probable Right to Recover

The party seeking an injunction must have at least one valid legal theory to support a probable right to recover.

---

6. For instance, in *Loye,* this Court noted that granting a temporary injunction based on a covenant not to compete does not present for appellate review the ultimate question of whether the covenant is enforceable under the Texas Business and Commerce Code. *Loye,* 156 S.W.3d at 619. The Court reviewed only the trial judge's exercise of discretion in determining that Travelhost showed it would likely succeed on the merits of the issue at final trial. *Id.*

*Brammer v. K.B. Home Lone Star, L.P.,* 114 S.W.3d 101, 110 (Tex.App.-Austin 2003, no pet.). We first review Ericsson's claims to determine whether it demonstrated a probable right to recover.

*Ericsson's Breach of Contract Claim*

Ericsson alleged:

Ericsson and MarketShare entered in a valid and binding contractual agreement, the Agreement, for good and valuable consideration. Ericsson fully performed its obligations under the Agreement. MarketShare has failed, and continues to fail, to perform its obligations under the Agreement, as detailed above, by failing to pay all amounts due and owing to Ericsson.

The trial court found "that Ericsson has shown a probable right of recovery from MarketShare because MarketShare has failed to comply with the express terms of the Distribution Agreement...."

▆▆▆▆ The elements of a breach of contract claim are (1) the existence of a valid contract, (2) the plaintiff's performance or tendered performance, (3) the defendant's breach of the contract, and (4) damages as a result of the breach. *Sullivan v. Smith,* 110 S.W.3d 545, 546 (Tex. App.-Beaumont 2003, no pet.); *see also St. Paul Ins. Co. v. Rakkar,* 838 S.W.2d 622, 629 (Tex.App.-Dallas 1992, writ denied). When examining the language of a contract, we must give effect to the true intention of the parties as expressed in the instruments. *See Lenape Res. Corp. v. Tenn. Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996). We accord the language in a contract its plain meaning unless doing so would defeat the parties' intent. *DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 101 (Tex.1999). We presume

that the parties intended every clause to have an effect. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996).

▆▆▆ Ericsson proved the existence of a valid agreement, the Distribution Agreement, as the basis for its claim. And the terms of the original distribution agreement do not contemplate the payment arrangement upon which Marketshare claims it was relying when Ericsson terminated the contract. Furthermore, Jerry Mayo, Marketshare's CEO, testified that as of the date of termination, Marketshare owed Ericsson $500,000. Although Mayo also testified that Marketshare was worth $2.5 million at the time the contract was terminated, he testified that Marketshare had only several hundred thousand dollars in cash. And an e-mail following the credit hold from Marketshare's president and general counsel, Michael LeBrun, indicated cash flow problems: "[W]e can't pay you if we don't have cash flow and we can't have cash flow if you clamp down on credit." Because there was evidence that Marketshare did not abide by the terms of the original agreement, that Marketshare still owed Ericsson at least $500,000 by Marketshare's own admission, and that Marketshare's finances were uncertain, we conclude, without making any determination on the merits, that the trial court did not abuse its discretion in finding that Ericsson has shown a probable right to recover on the breach of contract claims.

*Ericsson's Claim of Interference with Intellectual Property Rights and Contract*

Ericsson alleged:

that MarketShare interfered with and threatened to infringe upon Ericsson's intellectual property and trademark rights by falsely representing to third

parties, i.e. the VARs, that MarketShare currently has or will have the ability to re-license Ericsson's intellectual property and trademark rights. Ericsson believes said representations were false when made, with the intent of infringing on and interfering with Ericsson's intellectual property rights. MarketShare's actions also interfere with any prospective contractual relations that the VARs may wish to enter into with Ericsson, because Ericsson is the only source of the appropriate intellectual property rights, if the VARs desire to continue to sell Ericsson's products.

The court found "that Ericsson has shown a probable right of recovery from MarketShare because MarketShare ... has interfered with and infringed upon Ericsson's existing intellectual property and trademark rights and has made disparaging and untrue statements that have injured Ericsson's business reputation and caused substantial confusion in the marketplace."

 The Texas Supreme Court has defined the elements of interference with a contract, specifically, as: (1) the existence of a contract subject to interference, (2) the occurrence of an act of interference that was willful and intentional, (3) the act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred. *Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex.1995). Marketshare's July 14 communication to its VARs suggested that the VARs would breach their contracts with Marketshare if they contracted with anyone else to sell Ericsson products, including Ericsson. The communication also bore Ericsson's logo in its signature block. Both parties testified at the hearing that, following the termination, Marketshare attempted to sell Ericsson's products at a July 18, 2005 trade show in direct competition with Ericsson's booth. And finally, Mayo testified that Marketshare had planned to continue selling Ericsson products even after the termination. We conclude, without making any determination on the merits, that the trial court did not abuse its discretion in finding a probable right to recover on this claim.

*Ericsson's Business Disparagement Claim*

Ericsson alleged:

MarketShare has made false, misleading, and disparaging statements concerning Ericsson's business to the VAR's and potentially other third parties, for the purpose of injuring Ericsson's business, and deceiving the VAR's regarding MarketShare's breach of the Distribution Agreement and the ownership of Ericsson's intellectual property and trademark rights. Ericsson believes that MarketShare's disparaging statements were made with the intention of injuring or interfering with Ericsson's economic interests.

The portion of the court's findings that appears to relate to this claim is as follows: "MarketShare has made disparaging and untrue statements that have injured Ericsson's business reputation and caused substantial confusion in the marketplace." [7]

 To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false

---

**7.** We note that Marketshare did not highlight this language in the first issue as offensive to his free speech rights.

and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex.2003); *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex.1987). A business disparagement claim is similar in many respects to a defamation claim. *Forbes*, 124 S.W.3d at 170. The two torts differ in that defamation claims chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests. *Id.* In *Hurlbut*, a suit brought by an insurance agent against his former employer, the Texas Supreme Court noted that a business disparagement defendant may be held liable "only if he knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion." *Id.* (emphasis added) (quoting Restatement (Second) of Torts § 623A, cmt. g (1977)).

■■■■■ Ericsson claims it established a right of recovery on this claim because of the contents of the July 14 e-mail, specifically the language that criticized Ericsson's performance, stating that Marketshare had done nothing to bring Ericsson's actions about and that Ericsson did not honor the agreement. But "[i]t is well settled that Texas courts will not grant injunctive relief in defamation or business disparagement actions if the language enjoined evokes no threat of danger to anyone, even though the injury suffered often cannot easily be reduced to specific damages." *Brammer*, 114 S.W.3d at 107. The challenged language may be contrary to Ericsson's position or even later determined to be inaccurate, but Ericsson does

not contend that it evokes a threat of danger to anyone. In fact, Ericsson cites to testimony in the hearing in which its witness, Mr. Rosenberg, testified that "the end customers are confused about how to get product ordered that they need, the Value Added Resellers are confused about how do they develop their business and what is their business." But he did not testify that there was any actual "threat" to Ericsson such as was required in *Brammer*. We conclude, without making a determination on the merits, that the trial court erred in finding that Ericsson had shown a probable right to recover on this claim sufficient to justify injunctive relief. *See Brammer*, 114 S.W.3d at 107 (citing *Hajek*, 647 S.W.2d at 255 in which supreme court held that temporary injunction was unconstitutional prior restraint on free speech when it enjoined automobile owner from driving his vehicle with the message that the dealer sold him a "lemon" because message did not evoke a threat of danger to anyone).

*Probable Harm*

■■■■■ A trial court abuses its discretion in granting a temporary injunction unless "it is clearly established by the facts that one seeking such relief is threatened with an actual irreparable injury if the injunction is not granted." *See Markel v. World Flight, Inc.*, 938 S.W.2d 74, 80 (Tex. App.-San Antonio 1996, no pet.) (quoting *Dallas Gen. Drivers v. Wamix, Inc.*, 156 Tex. 408, 295 S.W.2d 873, 879 (1956)). And evidence of fear, apprehension, and possibilities is not sufficient to establish any injury, let alone irreparable injury. *Id.* at 79–80.

■■■■■ To demonstrate probable injury or harm, an applicant must show an injury for which there can be no real legal

measure of damages or none that can be determined with a sufficient degree of certainty, i.e., a noncompensable injury. *See Tex. Indus. Gas v. Phoenix Metallurgical Corp.*, 828 S.W.2d 529, 533 (Tex.App.-Houston [1st Dist.] 1992, no pet.); *Martin v. Linen Sys. for Hosps., Inc.*, 671 S.W.2d 706, 710 (Tex.App.-Houston [1st Dist.] 1984, no writ) (noting that examples of noncompensable injuries include company's loss of clientele, goodwill, marketing techniques, and office stability). This also means that Ericsson had to show that it did not have an adequate remedy at law.

■ Ericsson contends that Marketshare caused imminent, irreparable injury following the termination of the agreement by communicating with the VARs via letter and e-mail, attempting to market Ericsson products at a trade show, and using Ericsson logos in its communications. Particularly, Ericsson complains that Marketshare's communications caused confusion and loss of reputation in the marketplace and that Marketshare's appearance at the trade show and statements from Marketshare officers demonstrated that, absent the injunction, Marketshare had intended to continue selling Ericsson's products and sending out "false and threatening" communications to the VARS. But Ericsson did not introduce evidence that any of these actions actually threatened to harm or disrupt Ericsson's business. *See Markel*, 938 S.W.2d at 80 (requiring showing of threat of "actual" irreparable injury). Additionally, Ericsson did not show that the communications between Marketshare and its VARs were patently false, malicious, provocative of any damages, or threatened danger. Consequently, we conclude, without making a determination on the merits, that the trial court abused its discretion by restraining Marketshare's communications on these subjects.

Marketshare does not point to any specific language it contends should be deleted and instead argues that the entire injunction should be dissolved. We do not agree that Marketshare has demonstrated that the entire injunction should be dissolved. Instead, we conclude that the court abused its discretion in finding that Marketshare has made and should be restrained from:

> ... making false and disparaging statements to resellers regarding Ericsson's ability to sell its own product [page one]; [and]

> ... making false and disparaging statements regarding the parties' performance under that certain Ericsson Enterprise Distribution Agreement 3.2 by and between Ericsson and MarketShare, with an effective date of February 4, 2004 ("Distribution Agreement") [page two].

We delete these provisions.

In summary, we sustain appellant's third issue in part and overrule appellant's third issue in part.

## DENIAL OF MARKETSHARE'S REQUEST FOR TEMPORARY INJUNCTION

In its fourth issue, Marketshare argues that the trial court should have denied Ericsson's request for temporary injunction and instead granted its request for a temporary injunction. It argues that the modified temporary injunction fails to preserve the proper status quo because it should have restored its position to June 19, 2005, the day before Ericsson placed it on credit hold. In its reply brief, it also contends that it does not have an adequate remedy at law and that it showed a probable right of recovery. Essentially, Mar-

ketshare contends that it should have been allowed to sell Ericsson products exclusively and on the terms it contends it had agreed to with Ericsson which allowed it to continue to purchase products and pay for them over time.

*Probable Right to Recover*

■■■ Marketshare argues that it demonstrated a probable right to recover. Essentially, it argues that it presented evidence which, if believed, would show it is entitled to recover on its claims against Ericsson. But the court heard conflicting evidence about the contract and the allegations of breach as well as the other allegations of the parties and made a decision. We cannot find an abuse of discretion if the trial court based its decision on conflicting evidence. *Tom James*, 109 S.W.3d at 883; *Rugen*, 864 S.W.2d at 551. As a result, and without making a determination on the merits, we do not find that the trial court abused its discretion in denying Marketshare its requested relief by impliedly finding that it had not shown a probable right to recover.

*Status Quo*

■■■ Marketshare also argues that the injunction did not maintain the status quo. The purpose of a temporary injunction is to preserve the status quo. The status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex.2004); *see, e.g., Metra United Escalante, L.P. v. Lynd Co.*, 158 S.W.3d 535, 544 (Tex.App.-San Antonio 2004, no pet.) (holding that trial court did not abuse its discretion in determining that last peaceable, non-contested status of parties was operation of apartment complexes in ordinary course of business; sale of apartment complex and distribution of proceeds therefrom resulted in litigation); *Khaledi v. H.K. Global Trading, Ltd.*, 126 S.W.3d 273, 284 (Tex.App.-San Antonio 2003, no pet.) (holding that status quo is relationship of parties as it existed when Shaun held a second lien position on properties; Shaun's refusal to continue to subordinate his liens altered parties' relationship); *Tri–Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 588 (Tex. App.-El Paso 2003, pet. ref'd) (concluding that trial court could have rationally determined that last peaceable, non-contested status between parties during lengthy litigation was status of parties prior to Tipperary's filing of amended original petition, i.e., prior to new controversy as to whether Tri–Star must comply with affirmative vote for its removal as operator). "If an act of one party alters the relationship between that party and another, and the latter contests the action, the status quo cannot be the relationship as it exists after the action." *Benavides Indep. Sch. Dist. v. Guerra*, 681 S.W.2d 246, 249 (Tex. App.-San Antonio 1984, writ ref'd n.r.e.).

■■■ Marketshare argues that the last, actual, peaceable, non-contested status occurred before Ericsson imposed the credit hold.[8] Notably, although Marketshare argues that the court should have restored its position to a time before the credit hold, Marketshare did not contest Ericsson's right to impose the credit hold when it occurred. Instead, in a June 21, 2005 communication from LeBrun of Marketshare to Matsil of Ericsson, LeBrun con-

---

8. Marketshare does not argue that any other time period would have been an appropriate status quo.

ceded that Ericsson could rightfully extinguish Marketshare's credit: "we cannot quibble that you have the right to do what you have done." Now Marketshare contends that Ericsson did not really have the right to put it on credit hold because it was performing pursuant to their modified agreement. And at the hearing, LeBrun testified that he responded to the credit hold as he did because he was trying not to antagonize Ericsson and was not admitting that Ericsson was entitled to put it on credit hold.

However, if the court had ordered that the status quo to be preserved was the pre-credit hold status, it would have had to effectively decide to grant relief in favor of Marketshare because that relief would have forced Ericsson to continue to sell products to Marketshare on credit. Having decided that Marketshare was not entitled to injunctive relief, the court did not abuse its discretion in deciding not to maintain the pre-credit hold status. *Cf. Surko Enters., Inc. v. Borg–Warner Acceptance Corp.*, 782 S.W.2d 223, 224–25 (Tex.App.-Houston [1st Dist.] 1989, no writ) (holding that injunction divesting Surko of possession and title of inventory, accounts receivable, contract rights, and proceeds did not upset status quo when it was necessary to prevent further loss of collateral to third party).

Accordingly, we conclude that the trial court did not abuse its discretion in denying Marketshare the injunctive relief it requested. We overrule Marketshare's fourth point of error.

## CONCLUSION

We affirm the modified temporary injunction as modified.