

# Fourth Court of Appeals

## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-14-00152-CV

**LIGHTNING OIL COMPANY**,
Appellant

v.

**ANADARKO E&P ONSHORE, LLC**
f/k/a Anadarko E&P Company, LP,
Appellee

From the 365th Judicial District Court, Dimmit County, Texas
Trial Court No. 14-01-12171-DCVAJA
Honorable Amado J. Abascal, III, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice

Sitting:    Karen Angelini, Justice
            Sandee Bryan Marion, Justice
            Rebeca C. Martinez, Justice

Delivered and Filed:  October 29, 2014

AFFIRMED

Lightning Oil Company appeals the denial of its application for a temporary injunction to enjoin Anadarko E&P Onshore, LLC, f/k/a Anadarko E&P Company, LP, from drilling one or more horizontal wells through its mineral estate to access and produce from Anadarko's adjacent mineral estate.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(4) (West Supp. 2014) (authorizing interlocutory appeal of an order granting or denying a temporary injunction).  Because Lightning failed to prove an imminent and irreparable injury, we affirm the trial court's order.

**BACKGROUND**

Pursuant to two leases collectively known as the Cutlass Lease, Lightning owns a mineral estate of approximately 3,251.53 acres located in Dimmit County, Texas (the "Mineral Estate"). Briscoe Ranch, Inc. is the owner of the severed surface estate, known as Cochina East Ranch, which is attributable to Lightning's Mineral Estate. Briscoe Ranch owns the mineral interests for the rest of the Cochina East Ranch, and has a lease with Anadarko to develop the mineral estate. To the south of Lightning's Mineral Estate lies the approximately 15,200-acre Chaparral Wildlife Management Area ("Chaparral WMA") which is a wildlife sanctuary managed by the Texas Parks and Wildlife Department ("TPWD"). TPWD owns the surface estate of the Chaparral WMA and a 1/6 mineral interest.[1] The Light family, some of which formed Lightning Oil, own 5/6ths of the mineral estate.

In October 2009, Anadarko obtained an oil and gas lease commonly referred to as the Chaparral Wildlife Management Lease which gives it the right to develop the mineral estate underlying the Chaparral WMA. Although there are several existing wells drilled on the surface of the Chaparral WMA, Anadarko's lease requires it to utilize off-site drilling locations "when prudent and feasible," and to obtain authorization from the WMA land manager and comply with other restrictions before planning any drilling sites on the WMA. To date, Anadarko has not drilled from the surface of the Chaparral WMA, but has drilled horizontally from surface locations on the adjacent Rancho Encantado, which it also leases, to the west of the Chaparral WMA. Anadarko has been attempting to negotiate a surface use agreement with TPWD for the last few years.

The current dispute arises out of Anadarko's plan to drill into the Chaparral WMA mineral estate from drill sites located on the surface of the Briscoe Cochina East Ranch—along the

---

[1] The Texas Parks and Wildlife Department has filed an amicus curiae brief discussing the nature of the Chaparral WMA as a valuable public resource and urging us to affirm the trial court's order.

southern boundary where Lightning owns the Mineral Estate. Anadarko obtained permission from Briscoe Ranch, the surface owner, and entered into a written Surface Use and Subsurface Easement Agreement allowing it to establish drill sites for horizontal wells that will enter and cross through Lightning's Mineral Estate in order to reach Anadarko's mineral estate on the adjacent Chaparral WMA. One plan calls for 13 to 15 drill pads with up to five wells each. Anadarko informed Lightning of its plans and placed stakes to mark the surface location of a proposed well site on the Cochina East Ranch. Lightning opposed Anadarko's planned drilling operations and staked its own proposed well site, the Cutlass Well No. 3, at the same surface location.

After discussions reached an impasse, Lightning sued Anadarko asserting claims for trespass and tortious interference with contract and seeking declaratory and injunctive relief. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 65.011 (West 2008). Based on the allegations in Lightning's petition, the trial court granted a temporary restraining order, which was subsequently extended by agreement. The temporary restraining order enjoined Anadarko from: (1) entering upon the Briscoe Ranch surface estate for the purpose of drilling any oil and gas well into or through the Mineral Estate; (2) attempting to drill any oil and gas well in or through the Mineral Estate; (3) interfering in any manner with the use, enjoyment, or interest of Lightning in and to the Mineral Estate; and (4) trespassing upon the Mineral Estate.

At the temporary injunction hearing, multiple documentary exhibits were introduced by both sides, including maps and photographs of the area, the relevant leases and surface use agreements, and email correspondence concerning the properties and various proposals. In addition, Lightning presented the testimony of two witnesses, its owner Walter Scott Light, and its petroleum engineer, Gary Bagnall, who both testified about the nature of the formations and drilling procedures in the area, a leaseholder's obligations, the two wells that Lightning has drilled on the Cutlass Lease and its proposed third well, as well as future drilling plans, and the potential

harm to its drilling operations from Anadarko's proposed wells. At the conclusion of the hearing, the trial court found that Anadarko's conduct may constitute a trespass into Lightning's mineral rights, but, based on the evidence presented, "there is no interference" with Lightning's mineral interests under the Cutlass Lease. The court denied the temporary injunction and dissolved the temporary restraining order. Lightning appealed.

## TEMPORARY INJUNCTION

A temporary injunction is an extraordinary equitable remedy whose purpose is to preserve the status quo of the litigation's subject matter pending trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993). To obtain a temporary injunction, an applicant must plead and prove three elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. The applicant is not required to establish that he will prevail on final trial, but rather that he is entitled to preservation of the status quo pending trial on the merits. *Walling*, 863 S.W.2d at 58. The status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (orig. proceeding) (quoting *Janus Films, Inc. v. City of Fort Worth*, 163 Tex. 616, 358 S.W.2d 589, 589 (1962) (per curiam)).

Whether to grant or deny an application for a temporary injunction is within the trial court's sound discretion, and we will reverse only for a clear abuse of that discretion. *Butnaru*, 84 S.W.3d at 204; *Walling*, 863 S.W.2d at 58. We may not substitute our judgment for that of the trial court unless the trial court's action was "so arbitrary that it exceeded the bounds of reasonable discretion." *Butnaru*, 84 S.W.3d at 204. The trial court does not abuse its discretion by making a decision based on conflicting evidence as long as the record reasonably supports the court's decision. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Metra United Escalante, L.P. v. Lynd*

*Co.*, 158 S.W.3d 535, 538 (Tex. App.—San Antonio 2004, no pet.); *see Shor v. Pelican Oil & Gas Mgmt., LLC*, 405 S.W.3d 737, 748 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (court abuses its discretion when the evidence does not reasonably support its determination that probable injury exits). At a temporary injunction hearing, the only issue is whether the applicant is entitled to preservation of the status quo of the suit's subject matter pending trial on the merits. *Davis*, 571 S.W.2d at 862; *Butnaru*, 84 S.W.3d at 204; *Blackthorne v. Bellush*, 61 S.W.3d 439, 442 (Tex. App.—San Antonio 2001, no pet.). The underlying merits and legal issues of the controversy are not before the court in an application for temporary injunction. *Shor*, 405 S.W.3d at 748; *Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 882-83 (Tex. App.—Dallas 2003, no pet).

## ANALYSIS

Lightning frames its appeal as raising three issues: (1) whether Anadarko's plan to drill through Lightning's Mineral Estate to reach its own adjacent mineral estate will constitute a trespass; (2) whether a third party surface owner with no interest in the Mineral Estate has the right to consent to such drilling activity; and (3) whether Lightning is entitled to an injunction to enjoin Anadarko's drilling plan. The parties spend the majority of their briefs discussing whether Anadarko's proposed actions will constitute a trespass on Lightning's Mineral Estate, and, to a lesser extent, whether Briscoe Ranch's consent to Anadarko's use of its surface estate for the drilling plan makes any difference. These legal issues, however, form the gist of Lightning's underlying lawsuit and will be determined at the trial on the merits. As such, it is not necessary or appropriate for us to determine these issues within the scope of this interlocutory appeal. *See Davis*, 571 S.W.2d at 862; *Cobb*, 109 S.W.3d at 882-83. Only Lightning's third issue concerning whether it was entitled to a temporary injunction pending trial on the merits is before us at this time. *See Butnaru*, 84 S.W.3d at 204; *Blackthorne*, 61 S.W.3d at 442.

On the limited question of whether Lightning proved it was entitled to a temporary injunction, the main disputed issue is whether Lightning proved that it would suffer an imminent and irreparable injury if Anadarko was permitted to proceed with its plan to drill through the Mineral Estate to reach the Chaparral WMA mineral estate.[2]  We must therefore examine the record to determine whether Lightning presented evidence proving that it would suffer a "probable, imminent, and irreparable injury" pending trial if Anadarko's drilling plans were not enjoined. *Butnaru*, 84 S.W.3d at 204.  We review the evidence in the light most favorable to the trial court's ruling, drawing all legitimate inferences from the evidence, and deferring to the trial court's resolution of conflicting evidence.  *Ireland v. Franklin*, 950 S.W.2d 155, 157 (Tex. App.—San Antonio 1997, no writ); *Shor*, 405 S.W.3d at 748.  When the trial court does not make findings of fact and conclusions of law, its ruling must be upheld on any legal theory supported by the record. *Davis*, 571 S.W.2d at 862; *Ireland*, 950 S.W.2d at 157.

Anadarko argues there is no evidence in the record that any injury to Lightning's Mineral Estate is "probable" as opposed to potential, "imminent" as opposed to future, or "irreparable" as opposed to compensable in damages.[3]  *See Butnaru*, 84 S.W.3d at 204; *see also Camp Mystic, Inc. v. Eastland*, 399 S.W.3d 266, 273 (Tex. App.—San Antonio 2012, no pet.) ("Probable injury is established by tendering evidence of imminent harm, irreparable injury, and an inadequate legal remedy.").  The requirement that the injury be probable and imminent is not satisfied by evidence indicating that the harm or injury is merely possible or feared; the commission of the act must be

---

[2] We assume without deciding that Lightning demonstrated a probable right to relief on one of its causes of action so that we may reach the determinative element of a probable, imminent and irreparable injury.

[3] Anadarko also argues Lightning failed to meet its burden under section 65.012 of the Civil Practice and Remedies Code, which authorizes injunctive relief prohibiting subsurface drilling if an adjacent landowner shows "loss of or injury to his minerals" that cannot be compensated in damages.  TEX. CIV. PRAC. & REM. CODE ANN. § 65.012 (West 2008).  However, in its petition Lightning pled for injunctive relief under common law equitable principles and under Civil Practice and Remedies Code section 65.011, not section 65.012. *Id.* § 65.011.

more than speculative and the injury that flows from the act must be more than conjectural to support injunctive relief. *Dallas General Drivers, Warehousemen & Helpers v. Wamix, Inc., of Dallas*, 156 Tex. 408, 295 S.W.2d 873, 879 (1956); *Camp Mystic*, 399 S.W.3d at 273; *Tex. Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 908 (Tex. App.—Austin 2009, no pet.); *Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 925 (Tex. App.—Dallas 2006, no pet.). An injury is considered "irreparable" if the injured party "cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. "That is, the applicant has to establish there is no adequate remedy at law for damages. An adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief." *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 427 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citation omitted); *Marketshare Telecom*, 198 S.W.3d at 925-26 (a noncompensable injury is one "for which there can be no real legal measure of damages or none that can be determined with a sufficient degree of certainty"). Money damages will generally be inadequate to compensate for the loss of property deemed to be legally unique or irreplaceable. *Shor*, 405 S.W.3d at 750.

Mr. Light's testimony on the issue of harm to Lightning from Anadarko's plan to drill through the Mineral Estate raised three areas of concern: (i) the potential use of inadequate casing by Anadarko which, if they were conducting fracking operations, could cause the fracking fluids to leak out and damage the hydrocarbon formations on Lightning's Mineral Estate; (ii) the lease obligation to drill one or more offset wells to prevent drainage from Anadarko's wells, at a cost of "millions of dollars" to Lightning; and (iii) the placement of Anadarko's drill pipes, or wellbore, in a location that would interfere with Lightning's planned wells, disrupting Lightning's drilling plan and creating additional costs in adjusting its plan.

On direct examination, Mr. Light stated if Anadarko was allowed to drill through the Mineral Estate it "certainly could" harm the value of the Mineral Estate. He explained that he had seen damage to producing formations caused by using inadequate casing during drilling, and has personal knowledge of casing failures occurring in the subject field by Anadarko. Mr. Light stated that, if Anadarko was fracking and if they had a casing failure, the fracking fluids "could" go into the Mineral Estate and damage the producing formation. Anadarko's drilling into the Mineral Estate would also give rise to an obligation under the Cutlass Lease to drill offset wells to protect against drainage. Mr. Light stated that, given Anadarko's proposed 15 drill pads with five wells each, the offset drilling obligation would place a "tremendous burden" on Lightning, costing "millions of dollars," and "would disrupt our drilling plan completely." If Lightning did not timely drill the offset wells, it would "have to pay a compensatory royalty [to the lessors] or we give up acreage." Finally, with respect to Anadarko's drilling pipe passing through the Mineral Estate, Mr. Light testified, "It will probably disrupt our drilling program. Those pipes will be in the way of our wells because we're going to drill ours in a westerly or a northwesterly direction . . . ." He noted it is "very difficult and costly" to turn and change drilling direction.

On cross-examination, Mr. Light agreed that, if there was a casing failure by Anadarko and Lightning's Cutlass Well No. 3 lost production, that loss could be quantified and compensated based on the reserve estimates for Cutlass Well Nos. 1 and 2. With respect to the burden of drilling offset wells, Mr. Light acknowledged that even if Anadarko were to drill from a different surface location and did not enter the Mineral Estate, Lightning would have the same offset obligation, and associated expenses, under its lease if Anadarko's well was close enough to the Cutlass Lease line to cause potential drainage. With respect to interference by Anadarko's drill pipes with any of Lightning's wells, Mr. Light conceded that the wellbore for the proposed Cutlass Well No. 3 "would never encounter any portion of Anadarko's planned wellbores" due to the 330 foot spacing

rules for the field. Mr. Light was later asked, "And with respect to Anadarko's proposed surface location, there is no way on God's green earth it will interfere with your proposed Cutlass 3 well, will it?" Mr. Light replied, "Subsurface-wise, no." Mr. Light also acknowledged that he staked the new well site and instructed Lightning's contractors to rush the permit for the proposed Cutlass Well No. 3 in time for the injunction hearing after he learned that Anadarko had staked its proposed well sites on the surface of the Cochina East Ranch.

Gary Bagnall, the petroleum drilling engineer for Lightning, testified on direct examination that there are other formations in the area above the Eagle Ford Shale, including "several known productive intervals" and others with "definite potential production." Mr. Bagnall stated there are always risks associated with drilling a well, including the risk of a casing failure or blowout underground which could cause the drilling fluids to spread out into the other formations, damaging them and making them "irreparable." He described it as "a real potential risk" and "a potential damage" that can also add a lot to the cost of drilling. He did not know whether Anadarko has had a blowout in the area. On cross-examination, Mr. Bagnall agreed there was a "high likelihood that it probably won't happen." With respect to a more minor well control issue, he conceded that Anadarko "probably will not lose control of the wells," but stated "it doesn't preclude that it might happen."

As to whether Anadarko's proposed five wells at the currently staked pad would interfere with the drilling of Lightning's Well No. 3, Mr. Bagnall agreed with Mr. Light that there would be no interference. On cross-examination, Mr. Bagnall was asked, "So, in sum, what we know for a fact, not speculation, is that the Cutlass 3 can be drilled without any problem from the five proposed wells. Correct?" and he confirmed that was correct. Mr. Bagnall further testified that he has plans to drill a Well No. 5 as an offset well that will parallel the south lease line at a distance of 330 feet away. He stated that his steering of the wellbore will be affected by the wellbores for

Anadarko's proposed five wells because it will pass close by and underneath Anadarko's wells. If his steering is off and Lightning's wellbore intercepts one of Anadarko's wellbores, it would be a "train wreck," especially if the Anadarko well was producing at the time. Mr. Bagnall stated that this difficulty in avoiding a collision with one of Anadarko's wellbores will be increased as Lightning drills more offset wells to counter Anadarko's 65 to 75 total wells (based on 13 to 15 proposed drill pads with five wells each). Mr. Bagnall also described how Lightning's drilling plans may need to be altered based on how much pipeline Anadarko lays and where they put it, as well as how many production facilities they erect and where they place them. Mr. Bagnall could not quantify the added cost at this time, but stated there would be significant costs, easily $100,000, involved in altering Lightning's drilling plan, stating, "When you're dealing with wells that cost $6 to $8 million or $10 million apiece, . . . a 10 percent bump in the cost of a well is a significant amount of money."

Lightning argues it was entitled to a temporary injunction because its evidence proved that it will suffer a probable, imminent, and irreparable injury due to the interference by Anadarko's drilling activity with Lightning's exclusive right to develop its Mineral Estate. We disagree. The evidence in the record shows a potential for injury to Lightning's mineral interests in the future, and a potential for increased costs to Lightning in the future. Further, Lightning did not prove that these potential injuries are not susceptible to quantification and compensation, and thus failed to prove the absence of an adequate remedy at law. *See Marketshare Telecom*, 198 S.W.3d at 925-26. Lightning failed to prove that any injury to its Mineral Estate, and its rights to develop the Mineral Estate, is "probable, imminent and irreparable" in the interim pending trial as required for the issuance of a temporary injunction. *See Butnaru*, 84 S.W.3d at 204. Viewing the evidence

and inferences in the light most favorable to the trial court's ruling, we conclude the trial court did not abuse its discretion in denying the application for a temporary injunction.[4]

*Conclusion*

Because Lightning failed to prove a "probable, imminent, and irreparable injury" would occur pending trial on the merits, we affirm the trial court's order denying its application for temporary injunction. *See Butnaru*, 84 S.W.3d at 204.

Rebeca C. Martinez, Justice

---

[4] In its brief, Lightning also asserts that its rights to develop the Mineral Estate will be irreparably injured by Anadarko's drilling plan because, in the course of drilling its wells, Anadarko will be required by the Railroad Commission to obtain Lightning's well logs which contain proprietary geophysical data developed by Lightning with regard to the Mineral Estate. However, no evidence was presented at the injunction hearing to support this claim of injury. Lightning further argues it proved an irreparable injury as a matter of law based on Anadarko's "continuing trespass," but this argument is dependent on a determination that a trespass exists which we have stated is the main contested issue in the underlying proceeding and, therefore, not before us in this interlocutory appeal. *See Butnaru*, 84 S.W.3d at 204; *Blackthorne*, 61 S.W.3d at 442; *Shor*, 405 S.W.3d at 748.